**SOUTHERN CONFERENCE OF TEAM-STERS and Truck Drivers and Helpers Local Union No. 568, Appellants,**

v.

**RED BALL MOTOR FREIGHT, INC., Appellee.**

**No. 23144.**

United States Court of Appeals
Fifth Circuit.

Feb. 28, 1967.

David R. Richards, Dallas, Tex., Mullinax, Wells, Mauzy, Levy & Richards, Dallas, Tex., of counsel, for appellants.

Hugh M. Smith, Allen P. Schoolfield, Jr., Charles D. Mathews, Schoolfield & Smith, Dallas, Tex., for appellee.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

The Southern Conference of Teamsters and its affiliated Local, Truck Drivers and Helpers Local 568 of Shreveport (Teamsters) brought an action against Red Ball Motor Freight, Inc. (Red Ball) in the United States District Court for the Northern District of Texas pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to enforce arbitration awards rendered by the Southwest Joint Area Grievance Committee. The district court found that the Grievance Committee was without jurisdiction to hear the grievances because a contract entered into by Teamsters, Red Ball and the Union of Transportation Employees (UTE) on September 1, 1964, by its terms temporarily suspended the operation of the grievance procedure in the collective bargaining agreements between Red Ball and the two unions, Teamsters and UTE. The Teamsters union appeals from the refusal of the district court to enforce the decisions of the Grievance Committee. Although we do not agree with the district court's interpretation of the contract dated September 1, 1964, we do agree with the result reached in the trial court and affirm.

Prior to July 1, 1964, Red Ball Motor Freight owned and operated two terminals in Shreveport, Louisiana, one under its own name, the Airport Drive terminal, and the other under the corporate name of Red Ball Motor Freight (Southeast), Inc., the Abbey Street terminal. These terminals were separate and distinct operations. The employees of the Abbey Street terminal were represented by the Southern Conference of Teamsters and various Locals affiliated therewith, including the Truck Drivers and Helpers Local 568. The Teamsters union and Red Ball were parties to a collective bargaining contract entitled "National Master Freight Agreement and Southwestern Area Local Cartage Supplemental Agreement" (Teamster Master Agreement) which had effective dates from February 1, 1964, to March 31, 1967. The employees of Red Ball at the Airport Drive terminal were represented by the Union of Transportation Employees, which union also had a collective bargaining contract with Red Ball. On July 1, 1964, the two Shreveport terminals were merged into a single corporate enterprise and by September 21 Red Ball had merged its terminals into a single operation by closing its Abbey Street Terminal and transferring its employees to the Airport Drive Terminal.

In order to resolve the resulting issue of union representation, Red Ball, Teamsters and UTE entered into a contract on September 1, 1964, (September 1 Contract) which provided, basically, for the National Labor Relations Board to conduct an election to determine which of the two unions would be the exclusive bargaining representative and that upon certification by the Board of the winning union, the contract of that particular union would automatically apply to all employees. The Board conducted an election on September 10, 1964, but due to objections filed by the Teamsters it was set aside. A second election was held on December 2, 1964, and again the Teamsters filed objections.[1] Consequently neither union has as yet been certified as the exclusive bargaining representative.

Subsequent to the merger, grievances arose among various Teamster employees. The union processed these grievances under the terms of its contract,[2] Teamster Master Agreement, which provides, in part, that grievance

1. On January 4 and 19, 1965, Teamsters Local Union 568 filed unfair labor practice charges against Red Ball alleging violations of §§ 8(a) (1) (3) and (5) of the NLRA. The case was docketed with the National Labor Relations Board as Case No. 15–CA–2589 and is presently pending before the Board.

2. Article 43: Grievance Machinery and Union Liability: Section 1 of this article establishes the procedures applicable to the settlement of any controversy which might arise between the parties. Such section reads:

"The unions and the Employers agree that there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement as provided for in this Agreement of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties the following procedures shall then apply:

(a) Where a State or Multiple State Committee, by a majority vote, settles a dispute no appeal may be taken to the Southern Conference Area Grievance Committee. Such decision will be final and binding on both parties.

(b) Where a State or Multiple State Committee is unable to agree or come to a decision in the case, by majority vote, such case shall automatically be put on the Agenda of the next Southern Conference Area Grievance Committee meeting, by the Secretary of the State or Multiple State Committee, and must be decided by the Southern Conference Area Grievance Committee at the next Southern Conference Area Grievance Committee meeting. The decision of the Southern Conference Area Grievance Committee, by majority vote, shall be final and binding on both parties.

(c) Except as provided in Section 6 of this Article, deadlocked cases may be submitted to umpire handling if a majority of the Southern Conference Area Grievance Committee determines to submit such matter to an umpire for decision. Otherwise either party shall be permitted all legal or economic recourse.

(d) Failure of any Committee to meet without fault of the complaining side, refusal of either party to submit to or

disputes be submitted for arbitration before a State or Multiple State Committee for final determination by majority vote which would be binding on both parties. The grievances were ultimately submitted to the Southwest Joint Area Grievance Committee which allowed claims for overtime pay, reinstatement, back pay and revision of job status. Red Ball refused to abide by the decisions of the Joint Grievance Committee and the Teamsters sought enforcement in the district court. The district court refused enforcement on the ground that the September 1 Contract suspended the operation of the grievance procedure of the collective bargaining agreements for grievances arising after the merger of the two terminals, September 21, 1964, and therefore these grievances could not be processed until after Board certification of either the Teamsters or the UTE.

The Teamsters union contends that the September 1 Contract did not by its terms suspend the operation of the collective bargaining agreement between it and Red Ball. The union also submits that the collective bargaining contract was not suspended as a matter of law by the merger of the terminals into a single operation. It is the contention of Red Ball that neither of the two collective bargaining agreements remained in effect after the merger and the filing of the representation petition with the Board and that recognition of either union would constitute a violation of the Na-

tional Labor Relations Act, 29 U.S.C.A. § 159(a).

The Teamsters union calls to our attention the fact that federal legislation [3] and Supreme Court decisions have clearly demonstrated that the national labor policy prefers that grievances be settled by the means selected by the parties to mediate controversies over the application or interpretation of an *existing* collective bargaining agreement. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); General Drivers, Warehousemen and Helpers Local Union et al. v. Riss & Co., Inc., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); United Steelworkers of America, etc. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). We have no quarrel with the above legal pronouncements. Our problem is to decide whether the Teamster Master Agreement *exists* as a valid and binding contract between the union and Red Ball and whether its arbitration provisions should be enforced in this proceeding. If we find that such agreement is still in force, we have no doubt that Red Ball would honor the arbitration provisions contained therein.

■ We have carefully reviewed the provisions of the September 1 Contract, produced in full below,[4] and conclude that the terms of such contract do not suspend or negate the separate collective bargaining agreements between Red Ball, the

appear at the grievance procedure at any stage, or failure to comply with any Committee decision withdraws the benefits of this Article.
(e) The procedures set forth herein may be invoked only by the authorized Union representative or the Employer."

3. 29 U.S.C. § 173(d) provides in part:
"Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."

4. The provisions of the September 1 Contract read as follows:
"This Agreement is entered into by and between Red Ball Motor Freight, Inc.,

herein called 'Red Ball', and the Southern Conference of Teamsters for itself and in behalf of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local Union 568 of Shreveport, Louisiana, herein called 'Teamsters', and the Union of Transportation Employees, herein called 'The UTE'.

The purpose of this Agreement is to effect settlement of all issues arising from the closing of the Red Ball terminal located at 1401 Abbey Street, Shreveport, Louisiana. Under date of August 20, 1964, Red Ball advised Teamsters and UTE of its intention to close said terminal (A copy of this letter is attached hereto and made a part of this Agreement as Ex-

Teamsters and UTE. In fact the terms of the September 1 Contract indicate the opposite. One phrase from the contract points out with particularity that the collective bargaining agreements were not considered as being terminated:

" * * * Red Ball covenants and agrees to recognize and abide by the collective bargaining agreement *presently in effect* with the union selected by the employees to represent them at Shreveport, Louisiana * * *." (Emphasis added)

The contract only abolishes the bargaining agreement of the losing union after a Board election and certification of the winning union. Although two elections have been held, neither union has been designated as the winner and consequently neither union has been certified as the exclusive bargaining representative. Therefore, the provisions of the September 1 Contract with respect to which contract of the two unions in-

hibit 'A') and that Red Ball would operate entirely out of the Red Ball terminal at 1214 Airport Drive, Shreveport, Louisiana. It is understood between all parties to this Agreement that presently employees reporting to The Abbey Street terminal are represented by the Teamsters Local Union No. 568 and that employees at the Airport Drive terminal are represented by the UTE, both groups of employees enjoying the benefits and obligations of the respective collective bargaining agreements between Red Ball, Teamsters and UTE at the respective locations. It is understood by all parties that on and after the closing of the Abbey Street terminal, now set for September 15, 1964, (See Exhibit 'A') there will be only a single group of employees employed by Red Ball reporting directly to the Airport Drive terminal. The group designation affected by this Agreement are all employees in the classification of local freight forwarding pick up and delivery and dock employees, as designated on the attached list designated as Exhibit 'B' and made a part of this agreement. Line drivers, mechanics and all clerical employees are expressly excluded from the terms and conditions of this Agreement.

It is also understood and agreed that the employees in the classification of local city pick up and delivery employees and dock employees reporting directly to the Airport Drive terminal after the date of certification by the NLRB as hereinafter provided will be covered by only a single contract with a single labor organization, either the Teamsters or the UTE, but not both. The determination of which labor organization will represent the employees in the classification covered by this Agreement reporting to the Airport Drive terminal and the contract covering said employees will be decided and governed by an election conducted by the Regional Office of the National Labor Relations Board.

Red Ball agrees to file a 'RM' petition with the appropriate region of the National Labor Relations Board. All parties to this agreement agree and covenant to enter into a consent election agreement subject to the approval of the Regional Director of the National Labor Relations Board whereby the Regional Office of the Board will conduct an election as more fully set out in the consent election agreement. The date of the election will be set out in the consent election agreement. All procedures of said election shall be supervised and controlled by the Rules and Regulations and the regular procedures of the National Labor Relations Board.

After the determination and certification of the results of the election by the agency conducting said election, Red Ball covenants and agrees to recognize and abide by the collective bargaining agreement presently in effect with the union selected by the employees to represent them at Shreveport, Louisiana, and certified by the National Labor Relations Board. Red Ball agrees to bargain and negotiate with the union so selected on all collateral issues arising from the integration of employees and/or the closing of the Abbey Street terminal.

The Union which is not selected by the employees covenants and agrees to abandon its present claim of representation for the employees in the covered classifications of this Agreement at Shreveport (Exhibit 'B' attached) and to accept the certification of the agency conducting said election as final and binding until March 1967. The Union not selected also covenants and agrees to forego and refuse to seek any litigation or other Court proceedings against Red Ball with respect to the aforesaid city employees at Shreveport and to cooperate with Red Ball in any action brought by any individual employee affected by this Agreement.

This Agreement is entered into this 1st day of September, 1964."

volved will ultimately prevail, have not come into operation.[5]

Our finding that the September 1 Contract did not finally suspend the collective bargaining agreements makes it necessary for us to determine whether these contracts, in toto or in part, are temporarily suspended as a matter of law by virtue of the merger of the two heretofore separate bargaining units into a single unit, which merger removed both unions from their prior status of exclusive bargaining representatives to the status of contenders for the title of exclusive representative. In view of the fact that at present neither union is the exclusive representative and that both are contestants in a heated battle to attain such position, is the employer Red Ball still required to deal with each union in accordance with the applicable collective bargaining contract, or in particular, is it required to abide by the provisions of the contracts regarding the processing of employee grievances? To resolve this question concerning the duties and obligations of an employer in such circumstances we look to the NLRA and the interpretative case law.

Section 8(a) (5) of the NLRA, 29 U.S.C. § 158(a) (5), makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. This section is subject to the provisions of Section 9(a), 29 U.S.C. § 159(a), which state that the representatives selected for the purposes of collective bargaining by the majority of the employees in the appropriate unit shall be the exclusive representatives of all employees in such unit. Therefore, according to the terms of the NLRA the employer is under a duty to bargain with the exclusive representative of his employees. In addition this statutory obligation exacts the negative duty to treat with no other representative. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); NLRB v. Pallette Stone Corp., 283 F.2d 641 (2 Cir. 1960); Plasti-Line, Inc. v. NLRB, 278 F.2d 482 (6 Cir. 1960); NLRB v. Draper Corp., 145 F.2d 199, 156 A.L.R. 989 (4 Cir. 1944).[6] In fact to bargain with a representative which is not the representative of the majority of the employees is to commit an unfair labor practice in violation of the NLRA. Medo Photo Supply Corp. v. NLRB, supra; Plasti-Line, Inc. v. NLRB, supra. Therefore according to the cited authorities, since neither the Teamsters nor the UTE is the exclusive bargaining representative, Red Ball is not obligated to deal with either and to

---

5. One interesting feature concerning whether the parties intended to suspend the collective bargaining agreements by the execution of the September 1 Contract is that Red Ball signed its bargaining agreement with the Teamsters on October 20, 1964, 50 days after the September 1 Contract and 29 days after merger. This event occurred as a result of the method by which the Teamster Master Agreement is negotiated. Representatives of numerous employers and unions formulate the terms of the contract. When an agreement is reached and accepted by all the parties involved, they sign a memorandum of understanding and agree that when the contracts are printed each employer and each union will sign a separate copy of the agreement. Usually many months pass before the agreement is received from the printers. Therefore even though the Teamster Master Agreement was formulated and agreed upon on or before February 1, 1964, Local 568 and Red Ball did not sign it until October 20, 1964. At the signing Red Ball gave no indication that the members of Local 568 employed at the Shreveport terminal were excluded from its terms, a proposition it now asserts. Although these facts strongly suggest that the signing by Red Ball and Local 568 is nothing more than mere formality, we find it interesting that Red Ball now claims that the collective bargaining agreement it signed on October 20 was then and had been, since September 21, the date the two terminals were merged, in a state of suspension.

6. Virginian R. Co. v. System Federation R.E.D., 300 U.S. 515, 548, 57 S.Ct. 592, 600, 81 L.Ed. 789, 800 (1937), while dealing with a dispute under the Railway Labor Act, contains similar language. See also comments from Congressional Committee Reports found in Medo Photo Supply Corp. v. NLRB, 64 S.Ct. 830, 833, 88 L.Ed. 1007, 1011 (note 2) (1944).

do so would violate the Act. This would seem to be dispositive of the case at hand if it were not for two important differences between the instant case and the above cited authorities. The first difference is that the cited cases dealt with situations where there was in existence a union which had been properly designated as the exclusive bargaining representative. Here neither union has been so designated. The other important difference is the fact that notwithstanding the existence of an exclusive representative, a minority group, a group of employees or another union, sought recognition or sought to bargain with the employer for the establishment of a collective bargaining agreement, or sought to deal with the employer independent of any bargaining agreement. Here we have no minority group seeking to bargain with Red Ball for the establishment of a bargaining contract nor do we have a group seeking to deal with Red Ball without such a contract. We merely have a union, albeit not the exclusive bargaining representative, seeking to process employee grievances through the machinery set out in its collective bargaining contract. Consequently while not disagreeing or casting any doubt on the cited cases, we do think that the instant case and the cited authorities are so factually dissimilar that they are not conclusive of the issues in this case.

The statutory obligation to bargain with the exclusive bargaining representative and treat with no other also applies in another situation. If a previously certified union is rejected at a Board conducted election and thereafter decertified by the Board, the employer must discontinue bargaining with the union because such would be a violation of Section 8(a)(1) of the Act in that it would be interfering with the employees' right to refrain from joining a union. Glendale

Manuf. Co. v. Local No. 520, ILGW, 283 F.2d 936 (4 Cir. 1960). In *Glendale* the decertified union sought to bargain with the employer for an employee wage increase. The court refused to compel the employer to bargain with a union which did not represent the majority of the employees in the circumstances presented.[7] While we recognize that both the Teamsters and the union in *Glendale* are not exclusive bargaining representatives, the Teamsters has not been decertified by the Board and the Teamsters does not wish to bargain for a wage increase but only to process employee grievances. Therefore we also find that the principles of *Glendale* are not controlling.

The factual setting of the case before us can be compared to a situation where two unions are sponsoring organizational drives among the same group of employees. In such a situation the employer's duty is one of strict neutrality. Welch Scientific Co. v. NLRB, 340 F.2d 199 (2 Cir. 1965); NLRB v. Burke Oldsmobile, Inc., 288 F.2d 14 (2 Cir. 1961). If the employer commits an act which demonstrates in any way a preference for one union over the other, it has interfered with the fundamental right of its employees to choose their own representative. This duty to observe strict neutrality even extends to a situation where an incumbent union is challenged by a new union. If such challenge presents a real question as to which of the two unions represents a majority of the employees, the employer is precluded from continuing its bargaining relationship with the incumbent union. St. Louis Independent Packing Co. v. NLRB, 291 F.2d 700 (7 Cir. 1961).[8] The principle of strict neutrality also governs the actions of Red Ball in the instant case. There is positively no doubt that there exists a very real question with respect to representation. Accordingly,

---

7. The court recognized that there are some exceptions to the rule that an employer may not bargain with a minority union. See Glendale v. Local No. 520, ILGW at page 939. Since these exceptions are inapplicable to the issues at hand they will not be detailed.

8. See also Midwest Piping & Supply Co., Inc., 63 NLRB 1060; William D. Gibson Co., 110 NLRB 660 (1954); Shea Chemical Corp., 121 NLRB 1027 (1958) discussed in St. Louis Independent Packing Co. v. NLRB, footnote 5, page 703.

Red Ball must conduct itself with utmost impartiality and we cannot compel it to violate its duty of neutrality so as to interfere with its employees' freedom of choice. Whether requiring Red Ball to recognize the collective bargaining contract, particularly the grievance machinery provisions, would destroy its role of a neutral and interfere with its employees' selection of a union, must be taken into consideration and will be discussed later in this opinion.

It is to be remembered that the Teamsters union only seeks the enforcement of various arbitration awards. In the recent case of John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court was faced with the problem of whether to compel arbitration in unusual circumstances. In *Wiley* the union, representing 40 employees, had a bargaining contract with its employer Interscience, which then merged with Wiley & Sons, Inc., which had no contract with its approximately 300 employees. The union brought suit to compel Wiley to arbitrate under the provisions of its collective bargaining agreement with Interscience. The Supreme Court held that the arbitration provisions of the contract survived the merger and were operative upon Wiley. The Court limited its decision in two important respects: (1) it found that there was substantial continuity of identity in the business enterprise which allowed the duty to arbitrate to survive the merger; and (2) the union did not assert a claim to continued representative status nor did it assert that it had any bargaining right, nor did

it assert the right to negotiate a new agreement and the Court declined to predict the outcome had the union so asserted the above claims.

The Court reached its decision through a recognition of the importance of the arbitral process in labor relations. It acknowledged "the central role of arbitration in effectuating national labor policy," [9] and saw arbitration as "the substitute for industrial strife." [10] The Court recognized arbitration as the preferred method [11] for settling disputes between labor and management and found that such preference could be denied only for compelling reasons. Also, the Court, relying on its decision in Retail Clerks Intern. Ass'n, etc. v. Lion Dry Goods, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962) [12] held that the fact that the union did not represent a majority but only 40 out of over 300 employees did not prevent it from representing those 40. But in both *Wiley* and *Retail* there was no problem of conflict with another union. There was, of course, the possibility that an arbitral award would require Wiley to favor the union employees to the detriment of the nonunion. The Court answered this problem with an affirmation of faith in the flexibility of the arbitration process.

In light of the *Wiley* decision the Court in United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3 Cir. 1964) held that a new owner by purchase is bound to arbitrate issues covered by and arbitrated under the labor contract of its predecessor. The Court very carefully restricted its ruling,

9. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898, 904 (1964).

10. United Steelworkers of America, etc., v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409, 1415 (1960).

11. This preference is well established. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580, 585 (1965); Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); United Steelworkers

of America, etc. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L. Ed.2d 1409 (1960).

12. This was an action by labor unions to compel enforcement of arbitration awards made pursuant to a strike settlement agreement between the unions and employers. The Court held that the arbitration provisions of the strike settlement agreement were enforceable although the labor organizations, parties to the agreement, were not exclusive bargaining representatives.

as did the court in *Wiley*, to the persistence of a duty to arbitrate.

In McGuire v. Humble Oil & Refining Co., 355 F.2d 352 (2 Cir. 1966), the Court, faced with the problem of whether a new owner, Humble, currently under a contract with Industrial Employees Association, Inc., the union representing its employees, was bound to recognize the arbitration provisions of the bargaining agreement between another union and its predecessor. Weber & Quinn, also considered the applicability of the *Wiley* principles. It found that the facts in *McGuire* so differed from those in *Wiley* that it refused to enforce the arbitration clause in the bargaining agreement with the Weber & Quinn union. For instance, in *McGuire* after Humble purchased the Weber & Quinn business it integrated 13 of the approximately 24 Weber & Quinn employees into its organization of which over 500 of its employees were represented by the Association. Humble filed with the Board a petition for clarification of the appropriate bargaining unit represented by the Association. The Board ruled that the former Weber & Quinn employees were effectively merged into the union represented by the Association and were no longer a single bargaining unit. Consequently, the Association became the exclusive bargaining representative of all the Humble employees including the former Weber & Quinn employees. The existence of an exclusive bargaining representative rendered *McGuire* factually distinguishable from *Wiley*. In *Wiley* not only was there no exclusive bargaining representative, there was not even another union. Consequently, to compel Humble to deal with the Weber & Quinn union would foster rather than prevent industrial strife and unrest and would probably force Humble to commit an unfair labor practice by dealing with a minority union when a majority is in existence. The court was also seriously concerned about the possibility of conflict between the interest of the Humble employees as a whole and the interest of the former Weber & Quinn employees. The court found that the application of the arbitration provisions under the Weber & Quinn bargaining agreement might well result in preferential treatment toward former Weber & Quinn employees which would adversely affect the other Humble employees.

So too must we examine the principles of *Wiley* in light of the situation before us. A comparison of the factual settings of *Wiley*, *McGuire* and the present controversy leads us inescapably to the conclusion that we have neither a *Wiley* nor a *McGuire* situation. The case at bar presents a factual situation somewhere in between the two cases mentioned. The feature that distinguishes the present case from *Wiley* is that two unions are present here, whereas in *Wiley* there was only one. *McGuire* is distinguished on the basis that there is no exclusive bargaining. representative in the instant case, whereas the opposite was true in *McGuire*. Therefore we must determine what the effect would be on labor-management relations in the particular circumstances of the case before us if we ordered Red Ball to recognize the distinct grievance procedures of the two separate collective bargaining contracts. involved.

If we should order Red Ball to process employee grievances with both unions, under the two separate contracts involved, we do not know what effect such an order would have on the manner in which each union deals with its employees. In view of the fact that each union is actively seeking support among all the employees, its handling of employee grievances may well be scrutinized by the employees even to the extent that it becomes a determining factor in deciding which union to choose. Consequently, the unions would be under pressure as they evaluated the various complaints of their members. Ordinarily this pressure would be undesirable because quite often a union, which is concerned with the welfare of all its members, might possibly decide not to press the grievance but instead use it as a bargaining tool. But here the unions are not in bargaining positions, and

therefore, many of the considerations inherent in deciding whether to press an employee grievance are removed. Perhaps, because the eyes of all the employees are upon them, it would spur the unions to handle grievances with an efficiency hitherto unknown in the industrial world.

However, we cannot order Red Ball to deal with the union about grievances without destroying its position as a neutral. The duties [13] entailed in participating in the resolution of employee grievances are irreconcilable with the duties of a neutral. Neutrality would be violated if Red Ball acted directly or indirectly for the benefit of either the Teamsters or the UTE. Even if Red Ball acted justly and fairly in the disposition of all complaints presented, the results of its decisions could well be more favorable to one or the other union. The election results [14] indicate that the race for exclusive bargaining representative is a close one. In such a situation we find that any activity on the part of Red Ball could be influential and possibly even decisive in future elections. Therefore, ordering Red Ball to deal with the unions, even in this limited sense, would be in effect ordering it to discontinue its role of neutrality and to violate the Act.

In addition, we find that processing grievances under the Teamster bargaining contract might well result in grievance settlements and arbitration awards that adversely effect UTE employees and vice versa. Although we are mindful of the Supreme Court's belief in the flexibility of arbitration and actually share such belief, we also share the apprehension felt by the Court in *McGuire*.

While it may be true, as asserted by the Teamsters, that none of the grievances which have actually been handled to-date involve any conflicting rights of the employees under their respective contracts, other grievances may arise under the Teamster contract the settlement of which would produce detrimental results for UTE members. Consequently, the resolution of one employee grievance under one of the contracts might be the basis for another grievance under the other contract which would in turn produce a series of complaints. It may be that the settlement of some grievances affect only the individual rights of the particular employee who has a special grievance. On the other hand, the rights of others may be affected in the determination of seniority status, the decision as to which employees are permanent and which are casual workers, who is entitled to overtime and similar matters.[15] Therefore, allowing the grievance machinery to remain in force would more likely produce industrial strife rather than prevent it.

██ We take cognizance of the fact that every grievance always gives rise to unrest in industrial relations and such grievances should be settled quickly and fairly in order to prevent the strife that usually accompanies them. But the resolution of such grievances should never give birth to additional unrest and dissatisfaction. We conclude that enforcing the arbitration awards presented to us and allowing the distinct grievance machinery provided in both the Teamster and UTE separate and distinct bargaining agreements to remain in force, would do just that.

The judgment is affirmed.

---

13. According to Article 43, Section 1 of the Teamster Master Agreement, see footnote 2, the employer and the union make the initial effort to settle disputes. Therefore by the terms of the contract the employer has a responsible position in the adjustment of grievances. We have read the grievance procedures in the UTE bargaining contract and find that such agreement also delegates responsibility to the employer in the settlement of disputes.

14. The first election held on September 10, 1964, resulted in a vote of 39 for the UTE and 37 for the Teamsters. In the second election 38 votes were cast for the UTE and 36 for the Teamsters.

15. The record discloses that some grievances did arise involving conflicting rights of employees under the Teamster and UTE contracts, but no disposition was made of such grievances.