**LOCAL FREIGHT DRIVERS, LOCAL NO. 208; Line Drivers, Local No. 224, etc., Plaintiffs-Appellees,**

v.

**BRASWELL MOTOR FREIGHT LINES, INC., Defendant-Appellant.**

No. 23174.

United States Court of Appeals, Ninth Circuit.

Feb. 10, 1970.

---

Theodore W. Russell (argued), of Russell & Schureman, Los Angeles, Cal., for appellant.

Albert Brundage (argued), of Brundage & Hackler, Los Angeles, Cal., for appellees.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

The plaintiff unions brought this action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to confirm as an arbitration award a decision of a labor-management committee formed under a collective bargaining agreement to consider grievances. The district court confirmed the award. We affirm.

Plaintiffs are local affiliates of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Braswell Motor Freight Lines, Inc. (Braswell) is an interstate common carrier by motor vehicle. Braswell's operations have been carried on through "Eastern" and "Western" Divisions and through a subsidiary company, Braswell Freight Lines, Inc. (Freight Lines). Freight Lines was merged into Braswell on July 1, 1964, and Braswell has since then conducted the former operations of Freight Lines as a separate division.

Each of the three divisions operates in a different geographic area and has its own history of labor relations. The Eastern Division employees have at all times been non-union. Freight Lines employees have been represented by certain local Teamster affiliates (the Southern Locals). Freight Lines was a member of a multi-employer group which had negotiated a contract with the Southern Locals expiring on January 31, 1961. Before the termination of that contract, Freight Lines withdrew from its employer group and negotiated for a new contract directly with the Southern Locals, but without reaching an agreement. The Southern Locals went on strike against Freight Lines on April 23, 1962, and on April 28, 1962, they filed unfair labor practice charges against Freight Lines.[1]

Braswell's Western Division employees are represented by the plaintiff unions among others. Braswell is a member of the California Trucking Association, Inc. (CTA) which represents it for bargaining purposes. CTA on September 15, 1961, entered into "the 1961 Western Master Agreement" with the unions,

---

1. For the ultimate disposition of these proceedings, see Teamsters Local Unions v. NLRB, 1966, 125 U.S.App.D.C. 204, 370 F.2d 226.

which ran from July 1, 1961 to June 30, 1964, and which with supplemental agreements covered Braswell's Western Division employees.

The grievance underlying the present dispute between the parties arose from a strike by the unions against Braswell's Western Division from June 11, 1962 to April 1, 1963. The strike was called and maintained by the unions as a protest against the unfair labor practices allegedly committed by Freight Lines against the Southern Locals. Braswell continued operations throughout the strike period by hiring other employees to replace the strikers. After the strike ended the unions demanded that Braswell restore the strikers to their former positions, without loss of seniority. Braswell refused to do so on the ground that the strikers had been permanently and legally replaced and had ceased to be employees. Braswell was willing to employ the strikers as new employees as positions became available. The 1961 Agreements remained in force.

The unions sought to vindicate their contentions regarding the strikers by initiating proceedings under the grievance provisions of the 1961 Master Agreement.[2] This Agreement provided for grievance committees composed of equal numbers of union and management representatives for various geographic areas covered. The relevant committee in this case was the Southern California Joint Area Committee. In this opinion, we refer to it as the 1961 Joint Area Committee. At a hearing before this committee Braswell entered a special appearance challenging the right of the committee to hear and determine the grievances. The Committee voted to overrule these objections, and to hear the cases. At the hearing on the merits,

Braswell again specially appeared. The Committee proceeded, but deadlocked on the merits. The 1961 Agreement provided that at this stage unresolved disputes would be heard by a Joint Western Committee. It is referred to in this opinion as the 1961 Joint Western Committee. On November 12, 1963, the 1961 Joint Western Committee postponed hearing the cases until the unfair labor practice charges before the NLRB regarding Freight Lines and the Southern Locals could be resolved.

Shortly thereafter, Braswell, through CTA and other employers and employer groups, entered into the "1964 National Master Agreement" for the period July 1, 1964 to March 31, 1967. The grievance machinery under this agreement called for a similar grievance committee structure to include a number of Joint State Committees; we refer to the pertinent committee as the 1964 Joint State Committee, a single Joint Western *Area* Committee, which we refer to as the 1964 Joint Western Area Committee, and Multi-Conference Committee, which we refer to as the 1964 Multi-Conference Committee.

The 1964 Agreement did not specifically provide that its machinery would be used to resolve disputes arising under the 1961 Agreements. However, the 1964 Joint State Committee retained the membership and functions of the 1961 Joint Area Committee, and the 1964 Joint Western Area Committee retained the membership and functions of the 1961 Joint Western Committee, substantially unchanged.

The 1964 Joint Western Area Committee retained the dispute after the 1964 Agreement went into force. On July 30, 1965 the National Labor Relations Board decided the unfair labor practice

2. When the union first brought these grievances Braswell filed an action in the United States District Court seeking a declaration with respect to its duties to submit the grievances to the grievance machinery set up under the 1961 Agreement. The District Court held that Braswell was under a duty to submit the grievances under the 1961 Agreement. An appeal from the judgment of the District Court in this declaratory relief action is now pending in this court, as Braswell Motor Freight Lines, Inc. v. International Brotherhood of Teamsters, No. 20,146.

case of the Southern Locals, finding that Braswell had committed unfair labor practices. (See 154 N.L.R.B. 101 (1965).) The 1964 Joint Western Area Committee then proceeded to consider the dispute, but it deadlocked on the actual disposition of the case. The 1964 Multi-Conference Committee, a creature only of the 1964 Agreement, then considered the case because of the deadlock below. It decided that the 1964 Joint Western Area Committee had jurisdiction to determine the dispute and directed it to determine the grievances on the merits. The 1964 Joint Western Area Committee proceeded to do so, sustaining the grievance on the merits and ordering that strikers who thereafter made an unconditional offer to return to work should be offered reinstatement with full seniority from their last original date of hire. The Committee did not award back pay.

The district court's confirmation of their decision is challenged here on three grounds. Braswell claims (1) that the grievance committees set up under the 1964 Agreements had no jurisdiction to hear grievances arising under the 1961 Agreements, (2) that the committee's decision is not enforceable as an arbitration award because it is not a final, definitive settlement of the dispute, and (3) that the disputes raised by the unions were not grievable under the 1961 Agreement.

*1. Did the 1964 Agreement's grievance committees have jurisdiction?*

 The right to arbitrate disputes or to process grievances is wholly dependant upon the terms of the collective bargaining contract. United Steelworkers v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409; Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 2 Cir., 1962, 312 F.2d 181, 184. And, "the question of arbitrability is for the courts to decide." United Steelworkers v. Warrior & Gulf Navigation Co., *supra*, 363 U.S. at 583 n.7, 80 S.Ct. at 1353. Here, the grievances arose un-

der the 1961 Agreements but were decided by a Committee created by the 1964 Agreements. Braswell's claim that the Committee lacked jurisdiction rests upon the absence of specific language in the 1964 Agreements granting the new committees jurisdiction over unresolved disputes arising out of the earlier agreement. The unions assert that the jurisdictional issue is "procedural" and accordingly should be resolved by the arbitrator and also that the parties' intent during bargaining for the 1964 Agreements was that pending grievances would be processed under the new agreement's procedures.

The argument that the jurisdictional issue was "procedural" and thus left to the grievance committee to decide rests on an interpretation of John Wiley and Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898. *John Wiley* warned against arbitrarily classifying "intertwined issues of 'substance' and 'procedure' growing out of a single dispute and raising the same questions on the same facts" (376 U.S. at 557, 84 S.Ct. at 918), and further indicated that:

> "Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." (*Id.*)

Both parties agree that the relevant agreement to be applied to the merits of this dispute is the 1961 Agreement. The question is only whether the parties were to use the 1964 system of joint grievance committees to complete procedures begun before the 1961 Committee.

Questioning the propriety of a given forum raises issues which would probably not ordinarily be considered procedural. Here, for example, the focus of the grievance machinery shifted from a regional basis in the 1961 Agreement to the national emphasis in the 1964 Agreement. The 1964 Multi-Conference

Committee was added as a new and additional step in the review heirarchy, and it had as members people who were further removed from the influence of the parties. In addition, the new grievance procedure was broken down by trades where the earlier procedure applied to all employees in the eleven western states.

Nonetheless, resolution of the grievance had been stayed by the 1961 Joint Western Committee, and the 1964 Joint Western Area Committee which again took up the matter was substantially the same institution. The three employer members and two of the three union members were the same. These were the people who "replaced [the grievance] on the agenda," i. e., took jurisdiction after the 1964 Agreement went into effect, deadlocked, and thus passed the matter up to the new 1964 Multi-Conference Committee for resolution. The nearly identical composition of the committees, and their substantially identical functions, when coupled with the fact that the changes which were made arose out of a continuing bargaining relationship, suggest that the courts should defer to the committees' decision on jurisdiction rather than choose to decide the question de novo.

The 1964 Committees were also in a good position to consider the arguments regarding the intent of the parties in negotiating the 1964 Agreements. These arguments are presented to us as independent grounds for finding that the 1964 Committees had jurisdiction over the carry-over dispute. This court has held that evidence relevant on the question of arbitrability includes evidence of the parties' intent as expressed during collective bargaining. See Communication Workers v. Pacific Northwestern Bell Telephone Co., 9 Cir., 1964, 337 F.2d 455, 458–459; cf. Association of Industrial Scientists v. Shell Development Co., 9 Cir., 1965, 348 F.2d 385, 388 n.3. The only evidence in the record is that the parties did intend that the 1964 Committees were to have jurisdiction over carry-over disputes.

In sum, on these facts we conclude that the 1964 Committees were the proper forums to consider unresolved disputes arising from the earlier agreements. The question of jurisdiction was one for those committees to decide.

2. *Was the grievance committee's decision a final settlement?*

General Drivers Union No. 89 v. Riss & Company, Inc., 1963, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918, dealt with grievance machinery comparable to that at issue here, and held that "if the award at bar is the parties' chosen instrument for the definitive settlement of grievances under the Agreement, it is enforceable under § 301." (372 U.S. at 519, 83 S.Ct. at 791.) The Court seemed to equate "definitive settlement" to a "final and binding [grievance award] under the collective bargaining agreement." (372 U.S. at 520, 83 S.Ct. at 791.) The *Riss* case was remanded for trial on issues which included the finality point. Here, as in *Riss*, the fact that the dispute settlement steps are not denominated as arbitration proceedings is not of particular consequence and certainly does not prevent our giving effect to them just as we would to proceedings labelled "arbitration."

In both the 1961 and 1964 Agreements the grievance machinery provided contemplates the possibility of a deadlock on the merits at the highest available grievance-appellate level. When such a deadlock occurs the parties are relieved of their no-strike pledge and must thereafter resolve their difference by such self-help action as each deems will be most effective. Here, however, there was a decision, not a deadlock at the highest level. Further, both agreements provide that the union can strike, etc., to enforce an award reached by a grievance committee which was able to resolve a dispute. Article 9, Section 1(i) of the 1961 Agreement also provided:

"In the event of strikes, work stoppages, or other activities which are permitted in case of deadlock, default

or failure to comply with majority decisions, no interpretation of this Agreement by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement. Nothing herein shall prevent legal proceedings by the Employer where the strike is in violation of this Agreement."

Article 43, Section 1(g) of the 1964 Western States Area Supplemental Agreements and Article 8(d) of the 1964 National Master Freight Agreement are identical.

Braswell relies upon the fact that neither party can "go to grievance" with foreknowledge that, win or lose, the resulting decision will be enforceable only by judicial action. It also contends that sanctioning a lawful strike or threat of such strike as the remedy to enforce settlement cannot possibly qualify as a "final adjustment" promoting industrial peace within the spirit and meaning of the Supreme Court's *Steelworkers* trilogy.[3]

As an initial matter we note that the 1964 Agreements provide that a committee decision is specifically stated to be "final and binding," while no such statement is made in the 1961 Agreements. Such a statement of a legal conclusion is not determinative; rather, each agreement will be tested according to its effect.

■ The Fifth Circuit dealt with comparable questions in Teamsters Local Unions v. Braswell Motor Freight Lines, Inc., 5 Cir., 1968, 392 F.2d 1, *modified on petition for rehearing*, 395 F.2d 655. As to the deadlock possibility, in its *Braswell* case that circuit decided that: "Arbitration decisions reached (as opposed to deadlock situations) are final and binding." (392 F.2d at 8 n. 9a.) With that statement we agree even though we cannot determine whether the Fifth Circuit retreated from this position in its later modifying opinion on petition for rehearing.

■ The possibility of the union's striking to enforce a grievance committee decision is more troublesome. Much of the deference given by courts to arbitration decisions is derived from the Labor Management Relations Act's policy of promoting industrial peace through giving full play to "the means chosen by the parties for settlement of their differences under a collective bargaining agreement * * *." United Steelworkers v. American Manufacturing Co., 1960, 363 U.S. 564, 566, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (discussing 29 U.S.C. § 173(d). This policy is hardly served by sanctioning or otherwise encouraging strikes as an alternative means of enforcing grievance awards. But, as counsel for plaintiff unions stated, "an answer is we are in court, we are not in the street." By seeking court enforcement of the award, we think that the plaintiff unions have elected to forego their economic enforcement weapons. Accordingly, they should not be denied court confirmation of an otherwise final award. A case in which a union pursues both judicial and economic remedies will present a question for another court on another day. Compare Teamsters Local Unions v. Braswell Motor Freight Lines, Inc., *supra*, 392 F.2d at 8 n.9a.

We hold that the Committee's decision was final.

### 3. *Were the union's grievances arbitrable?*

■ The grievances filed by the unions on behalf of the discharged strikers were primarily based upon Article 10,

---

**3.** United Steelworkers v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343; United Steelworkers v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

section B-1 of the 1961 Western Master Agreement which provided:

"It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful primary picket line, including the lawful primary picket line of Unions party to this Agreement, and including lawful primary picket lines at the Employer's places of business."

Since the Agreement relates to the rights of employees to refuse to "enter upon any property involved in a lawful primary labor dispute" or to cross "any lawful primary picket line," the grievances do raise the issue of lawfulness of the dispute or of the picketing, or both. Braswell contends that this necessarily requires an inquiry into whether the strikers' activities were protected by section 7 of the National Labor Relations Act, as amended, 29 U.S.C. § 157, and thus that the issue is one for the National Labor Relations Board to decide. The unions insist that the grievance pertains only to rights guaranteed by the contract and requires only an interpretation of the contract.

We assume that in deciding whether the strikers' activities were lawful, the grievance committee necessarily decided a question which could have been taken to the Board in an unfair practice proceeding. Even so, Vaca v. Sipes, 1967, 386 U.S. 171, 183–184, 186–187, 87 S.Ct. 903, 17 L.Ed.2d 842; Carey v. Westinghouse Corp., 1964, 375 U.S. 261, 268, 84 S.Ct. 401, 11 L.Ed.2d 320; and Smith v. Evening News Association, 1962, 371 U.S. 195, 197, 83 S.Ct. 267, 9 L.Ed.2d 246, all indicate that arbitration or a suit in the federal or state courts is proper even though an alternative remedy before the Board is available.

Braswell seeks to avoid the thrust of these cases by contending that they do not stand for the proposition that a grievance committee is empowered to in-

terpret the Labor Management Relations Act. But even if such an interpretation was required to resolve this grievance, a necessary concomitant of jurisdiction over the dispute is the power to decide all questions raised, even if the National Labor Relations Board should eventually disagree. Cf. Carey v. Westinghouse Corp., *supra*, 375 U.S. at 272, 84 S.Ct. 401; Clanebach, Inc. v. Las Vegas Local Joint Executive Board of Culinary Workers, 9 Cir., 1968, 388 F.2d 766, 768.

We hold that the grievances were arbitrable.

Affirmed.