**PILOT FREIGHT CARRIERS, INC., Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.**

No. C–219–WS–72.

United States District Court,
M. D. North Carolina,
Winston-Salem Division.

July 23, 1980.

J. W. Alexander, Jr. of Blakeney, Alexander & Machen, Charlotte, N. C., William Kearns Davis of Hutchins, Tyndall, Bell, Davis & Pitt, Winston-Salem, N. C., for plaintiff.

Norman B. Smith of Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., Ira R. Mitzner, Robert J. Higgins of Dickstein, Shapiro & Morin, Washington, D. C., for defendant.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

This case was tried to a jury between May 5 and May 13, 1980. The plaintiff Pilot Freight Carriers, Inc. (Pilot), suing under 29 U.S.C. § 185, alleged that the defendant International Brotherhood of Teamsters (IBT or Teamsters) had breached the parties' collective bargaining agreement[1] by authorizing and supporting a strike against Pilot in July 1972. The strike had been called when Pilot refused to comply with a grievance committee's decision that the parties' collective bargaining agreement applied, by virtue of accretion, to Pilot employees working at newly opened terminals in Florida.[2] At the close of all

---

1. IBT argues that it was not a party to any collective bargaining agreement with Pilot and consequently cannot be liable under a breach of contract theory. *See, e. g.,* Trial Brief of Defendant, pp. 13–16 (February 19, 1980). The Court rejects that argument for the reasons set out *infra* at pp. 2–3.

2. Pilot maintains that the Florida workers were not its employees, but rather were independent contractors. The National Labor Relations Board (NLRB) has found to the contrary, however. Plaintiff's Exhibit 16, at p. 15; *Pilot Freight Carriers, Inc.,* 208 NLRB 853, 857 (1974). For the purpose of this Opinion, the

the evidence, this Court directed a verdict for Pilot on the issue of liability. Rule 50, Fed.R.Civ.P. The Court now enters this Memorandum Opinion to detail the reasons for the directed verdict.[3]

*The Collective Bargaining Agreement*

The collective bargaining agreement relevant to this action was entitled the National Master Freight Agreement (NMFA) and Southern Conference Supplement (Southern Supplement) and was effective from April 1, 1970 to June 30, 1973.[4] Plaintiff's Exhibit 5. The NMFA was a national agreement applicable to all covered employers and Teamster locals; the Southern Supplement was a regional agreement which dealt primarily with local concerns.

As a part of its directed verdict, this Court held that IBT was a party to and obligated to abide by the provisions of the NMFA and the Southern Supplement. IBT argues that the agreement named as union parties only the Teamster locals and their national negotiating committee, the National Union Committee, and that IBT's only specific contractual obligation was to discourage wildcat strikes (Art. 8(a)(3)(a), NMFA)—an obligation irrelevant to Pilot's claim. IBT asserts its liability "could only be established by first identifying a contractual promise by it to take responsibility for the actions of [the locals which struck Pilot] or for its locals generally." Trial Brief of Defendant, p. 16 (February 19, 1980).

Although IBT carefully excluded reference to itself in the NMFA and the Southern Supplement, contractual draftsmanship does not control the issue. The Teamster locals did not exist independently of the international. A detailed review of the IBT constitution (Plaintiff's Exhibit 20) reveals, in the words of the Fourth Circuit, "such

far-reaching control of local unions that the locals, in essence, [were] not autonomous but [were] subdivisions of IBT." *Great Coastal Express, Inc. v. IBT*, 511 F.2d 839, 844 (4th Cir. 1975). The Court need not detail the various provisions of the IBT constitution which prove the point. The Fourth Circuit, in *IBT v. United States*, 275 F.2d 610 (4th Cir.), *cert. denied*, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960), a criminal case requiring a more stringent standard of proof, examined a precedent IBT constitution and found that it allowed the international to control the most fundamental of local union affairs. This Court has discovered no significant changes in the IBT constitution relevant to Pilot's suit. The Court therefore believes that, as a matter of law, the Teamster locals, as parties to the NMFA and the Southern Supplement, acted as the acknowledged agents of IBT and thereby obligated IBT to abide by the requirements of the collective bargaining agreement.

Moreover, IBT became a party to the agreement by virtue of the National Union Committee's participating in the bargaining process and signing the final agreement. The Third Circuit reached the same conclusion in *Eazor Express, Inc. v. IBT*, 520 F.2d 951, 958–59 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), *overruled on other grounds, Carbon Fuel Co. v. UMW*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). There, the court found that the National Union Committee was "organizationally and functionally an administrative arm of the International." 520 F.2d at 958 (quoting the district court). The court further found that IBT was fully obligated to abide by the agreement's no-strike pledge. 520 F.2d at 959.[5]

---

Court presumes the workers were Pilot employees.

3. By motion for summary judgment prior to trial and at the beginning of trial, IBT argued that Pilot's claim should be dismissed or stayed for failure to arbitrate the parties' dispute. *See* Memorandum of *Points and Authorities* (July 7, 1976). This Court denied IBT's motion in a Memorandum (January 19, 1977) and again at

the beginning of trial. The issue is not discussed in this Memorandum Opinion.

4. The facts that follow are either undisputed or taken in the light most favorable to IBT.

5. IBT's reliance on the decisions in *Carbon Fuel v. UMW*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), and *Teamsters Local 30 v. Helms Express, Inc.*, 591 F.2d 211 (3d Cir.

Article 8 of the NMFA and Article 45 of the Southern Supplement detailed the parties' grievance procedure. The procedure applied to "[a]ll grievances or questions of interpretations arising under [the] Master Agreement or Supplemental Agreements," Art. 8(a), NMFA, or "any controversy which might arise," Art. 45 § 1, Southern Supp. There were two types of disputes: (1) "factual grievances or questions of interpretation arising under the grievance provision of the Supplemental Agreement, (or factual grievances arising under the National Master Agreement) . . . ;" and (2) "request[s] for interpretation of the National Master Agreement . . . ." Art. 8(a)(1), NMFA. Disputes of the first type proceeded initially to a State or Multi-State Committee comprised, like all other grievance committees established by the contract, of an equal number of employer and union representatives. When that Committee decided a dispute by majority vote, the decision was said to be "final and binding on both parties." Art. 45 § 1(a), Southern Supp. If the Committee deadlocked, the case was referred to the Southern Conference Area Grievance Committee. Again, a majority vote by that Committee was "final and binding on both parties." Art. 45 § 1(b), Southern Supp. If the Conference Committee deadlocked, the case was referred to the highest employer-union grievance body, the National Grievance Committee (NGC), whose majority decision was "final and binding upon all parties." Art. 8(a)(2), NMFA.

Disputes involving *interpretations* of the NMFA were referred directly to the Southern Conference Committee, for the making of a record, and then to the NGC for decision. The NGC's interpretation of the

NMFA was "final and binding upon all parties." Art. 8(a)(2), NMFA; *see* Art. 45 § 5, Southern Supp.

In situations where the NGC deadlocked "then either party [would] be entitled to all lawful economic recourse to support its position in the matter." Art. 8(a)(2), NMFA. Also, a party's "failure to comply with any Committee decision" withdrew that party's rights under the grievance procedure. Art. 45 § 1(d), Southern Supp.; *see* Art. 8(d), NMFA. Thus, although the parties agreed there would be "no strikes . . . without first using all possible means of settlement as provided for in this Agreement of any controversy which might arise," Art. 45 § 1, Southern Supp., they recognized that the union had retained the right to strike in the appropriate circumstances.

*The Pilot—IBT Dispute*

In 1970, Pilot extended its eastern seaboard routes into Florida and opened terminals in four Florida cities. Although its other hourly employees were Teamsters and thus subject to the NMFA,[6] Pilot operated the Florida terminals non-union. None of the Florida workers had expressed a desire to become Teamsters, Order on Final Pre-Trial Conference ¶ (5)(f) (November 28, 1979), and, in any event, Pilot took the position that the workers were independent contractors, *see* n. 2 *supra.*

In April 1972, several Florida Teamster locals filed grievances with the local Multi-State Committee claiming that the accretion clause of the NMFA (Art. 2 § 3) required that the NMFA be applied to the Pilot employees in Florida. The accretion clause provided that the NMFA applied "to all accretions to the bargaining unit, includ-

---

1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1980), is misplaced. *Carbon Fuel* dealt with wildcat strikes and an international's liability for failing to use its best efforts to halt such strikes. The Court, in footnote 5, plainly distinguished the situation presented here, that is, an international union *authorizing* a strike in violation of the collective bargaining agreement. In the relevant portion of *Helms Express,* the Third Circuit dealt only with the propriety of dismissing an unfair representation claim against a union Conference which

was not a signatory to the NMFA. The court did not mention, and certainly did not overrule, its explicit holding in *Eazor Express.*

6. Pilot argues it was not a party to a portion of the Southern Supplement. Given this Court's holding that IBT was a party to the NMFA and the Southern Supplement, Pilot's argument is of little import. In any event, the facts taken in a light most favorable to IBT show that Pilot was a party to the entire Southern Supplement.

ing . . . newly established or acquired terminals . . . ." The Florida locals did not assert in their grievances (or at anytime thereafter) that any of the Pilot employees had designated IBT or its locals as their collective bargaining representative.[7]

Pilot responded to the Florida locals' grievances in four ways. First, it gained consecutive continuances (in April and June 1972) of the Multi-State Committee hearing. Second, on May 24, 1972, it filed with the National Labor Relations Board (NLRB) a unit clarification (UC) petition pursuant to § 9(c) of the National Labor Relations Act (NLRA), 29 U.S.C. § 159(c). By its petition, Pilot sought to clarify the Teamster national bargaining unit to exclude its Florida employees. Plaintiff's Exhibits 8 & 9. Third, it filed suit on June 12 in a Florida federal district court against IBT and various locals seeking to enjoin resolution of the grievances by any grievance committee. Pilot also sought a declaratory judgment that an accretion issue could only be decided by the NLRB. Defendant's Exhibit 46. Fourth, Pilot filed with the NGC and the Southern Area Conference on June 19 a request for an interpretation of the accretion clause in the NMFA, pursuant to Article 8(a) of the NMFA. In its request, Pilot argued that the NGC should interpret the NMFA to mean that only the NLRB could finally decide an accretion dispute. Plaintiff's Exhibit 10.

On June 13, an NLRB Hearing Officer began hearing testimony on Pilot's UC petition. The hearings continued until June 22. After a transfer to the NLRB and a remand to the Regional Director, 54 additional days of hearings were held between September 1972 and February 1973. The parties thereafter filed briefs and made oral arguments to the Board in the Fall of 1973. In the meantime, Pilot, on July 29 and August 9, 1972, filed unfair labor practice charges with the Board asserting violations by IBT of §§ 8(b)(1)(A) and 8(b)(3) of the NLRA. Hearings on those charges began in October 1973, but were recessed pending decision of the UC petition. In January 1974, the NRLB issued its opinion on the UC petition. It held that "the Florida operations as a whole, or as separate terminals, constitute separate appropriate units . . . ." The Board further held that "the extension of the 1970 contract [to the Florida operations] would . . . 'do serious violence to the mandate that employees' rights are to be protected . . . .'" Pilot Freight Carriers, Inc., 208 NLRB 853, 858 (1974) (quoting Melbet Jewelry Co., 180 NLRB 107, 109 (1969)).[8]

The Multi-State Grievance Committee met to decide the Florida locals' grievances in late June 1972 (shortly after the NLRB hearings had begun). Pilot sought to stay

7. IBT argues it was not trying to force the Florida employees to become Teamsters, but simply to have the NMFA "applied" to them. To support its argument, it notes Florida was a right-to-work state, the point apparently being that the employees could not have been required to join the union. IBT's position turns on technical distinctions that lack practical significance. Pilot's recognition of IBT as majority representative would have irrevocably inserted the union in the Florida operations and subtly coerced the employees into joining the union. The Fifth Circuit recognized this point in Boire v. IBT, 479 F.2d 778, 787–88 (5th Cir. 1973), a companion to the instant case. This Court does not accept IBT's differentiation between application of NMFA to the Florida operations and ipso facto initiation of the Florida employees into the IBT. This Opinion proceeds on the assumption that application of the NMFA accretion clause would have denied the Florida employees a free opportunity to decide whether they wanted to unionize. NLRB v. Retail Clerks Local 588, Retail Clerks International Association, 587 F.2d 984, 987 (9th Cir. 1978); Westinghouse Electric Corp. v. NLRB, 506 F.2d 668 (4th Cir. 1974); NLRB v. Horn & Hardart Co., 439 F.2d 674 (2d Cir. 1971); Pilot Freight Carriers, 208 NLRB 853, 858 (1974).

8. The Board also held, quoting Melbet Jewelry: "'We will not . . . under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit without allowing those employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the Union to represent them.'" 208 NLRB at 858.

Subsequent to the Board's decision on the UC petition, the parties settled Pilot's unfair labor practice charges.

the proceedings on several grounds. First, it informed the Committee that the UC petition was then pending before the NLRB and argued that any "NLRB ruling takes precedent [sic] over a grievance proceeding ruling in matters of this nature." Plaintiff's Exhibit 11, p. 68. It urged the Committee to defer until the NRLB decided the UC petition. Second, Pilot pointed out that the Florida district court was about to hear its preliminary injunction motion. Third, it notified the Committee that it had filed with the Southern Conference a request for interpretation by the NGC of the NMFA accretion clause ("the same issue as raised in this case," Plaintiff's Exhibit 11, p. 69) and urged postponement until the NGC had acted. The Committee rejected Pilot's motion. In so doing, a majority of the Committee ruled that the locals' grievances raised only factual issues and did not present a request for interpretation that required referral to the NGC. Plaintiff's Exhibit 11, p. 113. Pilot and the locals then presented evidence on the issue of accretion. The Committee decided, on June 22, 1972, that an accretion had occurred and that the NMFA and Southern Supplement applied to Pilot's Florida employees.

Pilot refused to comply with the Committee's ruling. *See* Plaintiff's Exhibit 4. On July 3, 1972, it refiled with the Southern Area Conference its request for NGC interpretation of the accretion clause in the NMFA. It also filed the same request with the Eastern Area Conference. Plaintiff's Exhibits 12 & 13. Neither the Conferences nor the NGC responded to Pilot's requests.

On July 7, 1972, the parties appeared in the federal District Court for the Middle District of Florida to argue Pilot's preliminary injunction motion. Pilot sought either of two injunctions: an injunction against the Florida locals' enforcement of the Multi-State Committee's decision; or an injunction against IBT and all its locals under the standards established in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).[9] The district court denied Pilot's motion on July 8, 1972.[10]

When Pilot still refused to comply with the Multi-State Committee's ruling, the Florida locals began picketing Pilot terminals on July 16, 1972. Pilot employees honored the picket lines and shut down much of Pilot's system.[11] On July 17, Pilot telegrammed the union chairmen of the Southern and Eastern Area Conferences to request confirmation "of whether or not [cessation of work] has been authorized by the . . . area conference."[12] Plaintiff's Exhibits 1 & 3. Both union representatives replied that the Florida locals' picketing

---

**9.** IBT argues that Pilot, in its pleadings, briefs, and arguments to the Florida district court, conceded the union's right to strike under the NMFA and Southern Supplement. Accordingly, it asserts Pilot is estopped to argue the strike was a breach of contract. The Court has reviewed the language cited by IBT and finds no grounds for estoppel. Pilot's primary argument before the district court was that it had no contract with the Florida locals and that, absent a contractual relationship, the locals could use the Multi-State Committee's decision and Pilot's refusal to obey as justification for a strike. Thus, Pilot sought to enjoin the effect of the Committee's decision until the NLRB had decided the UC petition. Consistent with this position, Pilot did not seek to enjoin IBT or other locals with whom it had a contract; it believed that the contract with those parties precluded a strike at least until the NGC decided its request for interpretation. Alternatively, Pilot sought a *Boys Markets* injunction against IBT on the theory that the parties had not fully arbitrated their dispute. *See* Memorandum In Support of Motion for Summary Judgment, Exhibit 13, pp. 4–29 (July 7, 1976).

**10.** The district court did not set out the grounds for its decision. Memorandum In Support of Motion For Summary Judgment, Exhibit 14. The transcript of oral argument suggests the court believed the NLRB was the only entity which could seek an injunction under the facts of the case. *See, e. g.*, Motion For Summary Judgment, Exhibit 13, pp. 29–32.

**11.** Since a part of the definition of "strike" is to quit work, the Florida locals, which were not comprised of Pilot employees, did not go on strike. Instead, they hired persons to travel to Pilot terminals and establish picket lines. The presence of the pickets and IBT's subsequent authorization of their picketing caused employees throughout the rest of the Pilot system to "strike."

**12.** *See* NMFA Art. 8(a)(3)(a).

was authorized and that Pilot employees had a right to respect the picket lines.[13] Plaintiff's Exhibits 2 & 4. IBT headquarters subsequently approved the strike activity and paid benefits to participating locals. *See* Plaintiff's Exhibits 22–25.

*Proceedings Prior To Trial*

On July 21, 1972, Pilot filed this action against IBT and asked for a preliminary injunction against the union's then on-going strike. This Court enjoined the strike on July 28, 1972, after finding that the parties' accretion dispute had "never been considered or passed upon by the National Grievance Committee as is required by the contract." It also found that Pilot had satisfied the injunctive requirements established by the Supreme Court in *Boys Markets v. Retail Clerks Union*.[14] IBT appealed.

The NGC heard Pilot's request for interpretation on August 18, 1972. The Committee did not address the question of whether it should refuse to hear the request on the ground that the Multi-State Committee had already decided that the Florida locals' grievances were factual disputes; instead, it simply received evidence on and decided the Pilot request for interpretation that had been filed with the Southern Area Conference. In years previous, the NGC had decided requests for interpretations of the NMFA's accretion clause as it applied to Braswell Motor Freight Lines and Red Ball Motor Freight.[15] *See* Motion for Summary Judgment, Exhibit 16, pp. 8 & 25–26.

Pilot argued to the NGC that the federal labor laws forbade application of the NMFA's accretion clause to the Florida operations. Thus, Pilot asserted, the Committee should either defer its decision until the NLRB decided the still pending UC petition, or apply court and NLRB precedent to the parties' dispute and find that no accretion had occurred. On August 21, the NGC rejected Pilot's arguments and held the NMFA applicable to the Florida operations. The Committee also held: "[T]his interpretation shall apply to all similar cases, and any dispute with regard to similarity shall be presented as a factual grievance through the regular grievance procedure." Plaintiff's Exhibit 15.

Thereafter, IBT voluntarily dismissed its appeal of this Court's injunctive order and moved for dissolution of the injunction. This Court granted the motion, finding that the grievance procedures had been exhausted and that a *Boys Markets* injunction was no longer justified. *Pilot Freight Carriers, Inc. v. IBT*, 353 F.Supp. 869 (M.D.N.C. 1972).[16]

On September 15, 1972, IBT notified Pilot it would resume its strike unless Pilot recognized IBT as the Florida employees' representative. Pilot thereafter sought assistance from the NLRB. The NLRB, on September 19, brought suit in federal court under § 10(j) of the NLRA, 29 U.S.C. § 160(j), seeking to enjoin any strike while Pilot's UC petition and unfair labor practice charges were pending. The district court granted the injunction, finding, *inter alia*, that " '[a]t no time have [the Teamsters], collectively or individually, offered Pilot proof of representation of a majority of the persons and individuals working at Pilot's

---

13. *See* NMFA Arts. 9 § 1 & 28.

14. This Court's findings of fact and conclusions of law issued in support of the July 28 injunction did not preclude IBT from litigating at trial the issue of breach of contract. *Atlantic Richfield Co. v. OCAW*, 447 F.2d 945, 948 (7th Cir. 1971); *Railroad Yardmasters v. Pennsylvania RR Co.*, 224 F.2d 226, 229 (3d Cir. 1955); *see* 9 & 11 Wright & Miller, *Federal Practice & Procedure* §§ 2567, at p. 696 & 2950, at pp. 495–96 (1973); 7 *Moore's Federal Practice* ¶ 65.21, at p. 65–157 (1979).

15. *See generally Teamsters Local Unions v. Braswell Motor Freight Lines, Inc.*, 392 F.2d 1 (5th Cir.), *modified*, 395 F.2d 655 (5th Cir. 1968), *cert. denied*, 401 U.S. 937, 91 S.Ct. 926, 28 L.Ed.2d 217 (1971); *Southern Conference of Teamsters Local 568 v. Red Ball Motor Freight, Inc.*, 374 F.2d 932 (5th Cir. 1967).

16. In so doing, however, this Court noted the NLRB's jurisdiction and stated: "[t]o which phases, if any, of plaintiff's Florida operations the decision of the Committee may be applied without constituting an unfair labor practice is not a matter to be determined by this Court." 353 F.Supp. at 872.

[Florida] truck terminals.'" *Boire v. IBT*, 479 F.2d 778, 785 (5th Cir. 1973). The Fifth Circuit affirmed. *Boire v. IBT, supra.* The NLRB thereafter decided the UC petition, in January 1974, holding that Pilot could not lawfully apply the NMFA to its Florida employees solely by virtue of the NMFA's accretion clause. *Pilot Freight Carriers, Inc.,* 208 NLRB 853 (1974). IBT did not refuse to comply with the Board's decision. Consequently, the Board never had cause to file a related unfair labor practice charge against the union, and the Fifth Circuit never reviewed the Board's holding on the UC petition. *See generally Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 151, 154, 61 S.Ct. 908, 913, 85 L.Ed. 1251, 1258–59 (1941); *McGuire v. Humble Oil & Refining Co.,* 355 F.2d 352, 357 (2d Cir.), *cert. denied,* 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966).

IBT moved for summary judgment in this case in July 1976. It argued that Pilot was required under the NMFA to arbitrate either the basic issue of breach of contract or the subissues which necessarily controlled the question of breach. IBT also argued that, in any event, its strike had been allowed by the NMFA and Southern Supplement. The Court denied IBT's motion in a Memorandum dated January 19, 1977. *See* note 3, *supra.* On IBT's motion, the Court certified its decision for interlocutory appeal. *See* 28 U.S.C. § 1292. The Fourth Circuit denied the appeal in an unpublished Order dated June 23, 1977.

*Breach Of The Collective Bargaining Agreement*

█ IBT breached the parties' collective bargaining agreement in four distinct ways: (1) it struck to enforce the Multi-State Committee's decision even though the Committee had no authority to decide requests for interpretations of the NMFA—in violation of IBT's express promise to exhaust arbitral remedies before striking; (2) it struck to enforce the Multi-State Committee's decision without first arbitrating several issues which controlled its right to strike—again in violation of its promise to exhaust arbitral remedies; (3) it struck to enforce the Multi-State Committee's accretion decision even though the NLRB was then considering the same issue and would issue a controlling ruling—in violation of its implicit promise to bargain with Pilot fairly and in good faith; and (4) it struck to force Pilot to commit an illegal act, that is, to apply the NMFA to the Florida employees solely by virtue of the NMFA accretion clause—again in violation of its promise to bargain fairly and in good faith.

*Strike to enforce an invalid grievance committee decision.* IBT struck in July 1972 to enforce the Multi-State Committee's decision that the NMFA should apply to Pilot's Florida employees by virtue of the NMFA's accretion clause. The Multi-State Committee was, however, without authority to consider the meaning of the accretion clause and, thus, to render any decision based upon that clause. The Florida locals' "grievance" required an interpretation of the NMFA accretion clause by the NGC, not the Multi-State Committee. Moreover, Pilot invoked its contractual right to request an interpretation by the NGC. IBT's strike was, therefore, based on an invalid decision and in breach of its duty to exhaust arbitral remedies.

Given the broad scope of the parties' grievance procedure, the meaning and effect of the NMFA's accretion clause was an arbitrable issue. *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409, 1417–18 (1960). And arbitration could proceed even though the NLRB had jurisdiction to render a controlling decision. *Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); *accord, Local No. 3–193, International Woodworkers v. Ketchikan Pulp Co.,* 611 F.2d 1295, 1298–99 (9th Cir. 1980); *Retail Clerks Local 588, Retail Clerks International Association v. NLRB,* 565 F.2d 769, 777 (D.C.Cir.1977). Arbitration is the preferred dispute resolution mechanism and, when agreed to by the parties, should proceed, hopefully to work its "pervasive, curative effect." *Carey v. Westinghouse,* 375 U.S. at 272, 84 S.Ct. at 409, 11 L.Ed.2d at

328; *accord, Retail Store Employees Union, Local 400 v. Great Atlantic & Pacific Tea Co.*, 480 F.Supp. 88, 93 (D.Md.1979).

The grievance's arbitrability does not end the inquiry, however. The question remains whether the grievance was decided by an arbitrator with the requisite jurisdiction. *Sappington v. Associated Transport Inc.*, 365 F.Supp. 164 (D.Md.), *aff'd*, 493 F.2d 1353 (4th Cir. 1973) (per curiam). An arbitrator can exercise only such authority as is conferred by the parties' collective bargaining agreement. Absent the authority to consider a grievance, the arbitrator's decision is of no force and effect. *See Torrington Co. v. Metal Products Workers Union Local 1645*, 362 F.2d 677, 680 (2d Cir. 1966). And a contract provision, as here, that the arbitrator's decision is "final and binding on the parties" cannot change the result. *Local Freight Drivers Local 208 v. Braswell Motor Freight Lines, Inc.*, 422 F.2d 109, 114 (9th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

The courts, not the arbitrator, determine the scope of the arbitrator's authority. In *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Supreme Court considered a suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, by employees (represented by the Teamsters) who contended, *inter alia*, that a grievance committee had exceeded its authority in deciding a seniority dispute. The union defendant argued in response that a clause in the collective bargaining agreement gave the committee the power to determine whether it could decide the seniority issue. The union asserted, therefore, that the committee's resolution of the issue precluded the employees' attack on the committee's authority. The Court disagreed. It found that the two relevant con-

tract clauses did not clearly give the committee the authority asserted by the union and held that the "[r]econciliation of these two provisions, going to the power of the committee under the contract, itself presented an issue ultimately for the court, not the committee, to decide." 375 U.S. at 345 n.8, 84 S.Ct. at 370, n.8, 11 L.Ed.2d at 379; *accord, Bieski v. Eastern Automobile Forwarding Co.*, 396 F.2d 32, 38 (3d Cir. 1968); *Sappington v. Associated Transport*, 365 F.Supp. at 166–168.

The Supreme Court's decision in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), does not establish a contrary rule. There, the defendant employer argued that it had no duty to arbitrate since various precedent steps had not been employed by the union; it further asserted that this "procedural" question should be decided by the court, not the arbitrator. The Court rejected the employer's argument, holding that "[o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." 376 U.S. at 557, 84 S.Ct. at 918, 11 L.Ed.2d at 909. This rule on "procedural questions," which the Court subsequently defined as claims which operate merely to "limit or qualify an arbitral award," 376 U.S. at 558, 84 S.Ct. at 918, 11 L.Ed.2d at 909, does not affect the rule in *Humphrey v. Moore* which speaks to the arbitrator's *power* to decide a grievance.[17] As the Ninth Circuit said in response to a similar Teamster argument based on *Wiley & Sons*, "[q]uestioning the propriety of a given forum raises issues which would probably not ordinarily be considered procedural." *Local 208 v. Braswell*, 422 F.2d at 112.[18]

---

**17.** *Wiley & Sons* and *Humphrey v. Moore* were decided during the same term, October 1963. Neither opinion mentions the other, presumably because they involve wholly separate issues.

**18.** The Eighth Circuit reached a contrary conclusion in *General Drivers & Helpers Union, Local 554 v. Young & Hay Transportation Co.*,

522 F.2d 562, 567 (8th Cir. 1975): "questions relating to whether an otherwise arbitrable dispute should be decided at the state or national level are to be decided within the arbitration system." The holding is contrary to the rule recognized by the Fourth Circuit in *Sappington v. Associated Transport Inc.*, 493 F.2d 1353 (4th Cir. 1973) (per curiam) (adopting the district court opinion, 365 F.Supp. 164 (D.Md.)),

**628**

Turning to the provisions of the NMFA and Southern Supplement, the Court concludes the Multi-State Committee lacked authority to decide the Florida locals' grievances.[19] The Southern Supplement, which governed the local grievance procedure, provided in Article 45 § 5 that "[g]rievances and questions of interpretation which are subject to handling under the provisions of Article 8 of the National Agreement shall be referred to the National Grievance Committee in accordance with such Article 8." In turn, Article 8(a)(1) of the NMFA provided that "[a]ny request for interpretation of the National Master Agreement shall be submitted directly to the Conference Joint Area Committee for the making of a record . . ., after which it shall be immediately referred to the National Grievance Committee." The language of Article 8(a) was explicit and without exception: requests for interpretation of the NMFA were for the NGC alone; the lower level grievance committees had no authority to consider such matters.[20] These provisions precluded the Multi-State Committee from deciding the Florida locals' grievances. The grievances asserted that a NMFA clause—Art. 2 § 3, the accretion clause—required that the NMFA be applied to Pilot's Florida operations. The grievances did not raise factual issues; Pilot's operations in Florida were organized and structured in a manner

undisputed by the parties. The sole issue for resolution was whether the accretion clause was intended to cover those operations. To decide that issue, the Multi-State Committee had to interpret the NMFA. Under Article 8(a) of the NMFA, however, it had no authority to perform such an act.[21]

If any doubt existed as to the Multi-State Committee's authority to decide the locals' grievances, Pilot's express requests for interpretations by the NGC removed those doubts. *See, e. g.*, Plaintiff's Exhibits 10, 12 & 13. In *General Drivers & Helpers Union, Local 554 v. Young & Hay Transportation Co.*, 522 F.2d 562 (8th Cir. 1975), a case also involving the NMFA, the employer sought to set aside a grievance committee award involving representation on the ground that the committee had based its award on an interpretation of the NMFA and was therefore without jurisdiction. The court held that the committee could decide whether it had authority to hear the case. *See* note 18 *supra*. The court qualified its holding, however, by noting that the employer had never raised the jurisdictional issue before the committee and "did not invoke its *right* under the contract to submit the matter directly to . . . the National Grievance Committee." 522 F.2d at 567 (emphasis added). Although this Court does not agree with the court that

see Trial Brief of Defendant p. 22 n.13 (February 19, 1980) (conceding this point). Moreover, as is noted *infra*, the opinion turns more on the facts of the case than legal principles and, in fact, supports the proposition that the Pilot's request for interpretation required that the NGC decide the accretion issue.

**19.** Pilot properly preserved its objections to the Multi-State Committee's jurisdiction. *See IBT, Local 249 v. Western Pennsylvania Motor Carriers Association*, 574 F.2d 783, 786 n.2 (3d Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978); *Local 719, American Bakery & Confectionary Workers v. National Biscuit Co.*, 378 F.2d 918, 921–22 (3d Cir. 1967).

**20.** Thus, the Multi-State Committee's decision that the locals' grievances did not present requests for interpretations of the NMFA is of no consequence. *See* p. 8 *supra*. If, in fact, the grievances did pose requests for interpretations, the Committee's decision could not give it authority it did not then have under the

NMFA. *See Torrington v. Local 1645*, 362 F.2d at 680.

**21.** Article 8(a)'s explicit restriction to the NGC of requests for interpretation precluded the contradictory interpretations that would have inevitably resulted from a different procedure. Article 8(a) also insured that issues of industry-wide significance were decided on the national level; absent such a procedure, employers who operated in more than one Conference would have faced inconsistent requirements, depending on the particular Conference's interpretation of the NMFA. Thus, in years prior to the instant dispute, the NGC had decided two major accretion disputes. *See* n.15 *supra*. Reviewing the NGC's decision that the accretion clause applied to a Braswell Motor Freight Lines merger, the Fifth Circuit said: "We hold that the dispute was a matter of interpretation under Article 8 . . . ." *Teamsters Local Unions v. Braswell*, 392 F.2d at 7.

the committee could determine its own jurisdiction, it does agree that, in any event, the employer's explicit request for an interpretation by the NGC would have divested the lower level committee of all power to consider the meaning of a clause in the NMFA.

IBT argues that, under Article 45 § 1(d) of the Southern Supplement, Pilot was obligated to abide by "any" Committee decision regardless of whether the Committee was without authority to render the decision. *See also* Art. 8(d), NMFA. The argument ignores both the controlling effect of Article 8(a) of the NMFA, and the fundamental rule that the arbitrator has no more authority than that which is conferred by the parties' agreement. Section 5 of Article 45 of the Southern Supplement renders the Supplement's grievance procedure subordinate to that established by the NMFA, and the first sentence of Article 8(a) of the NMFA reinforces that subordinate status. Thus, the phrase "any Committee decision" as used in Article 45 § 1(d) of the Southern Supplement must be read to mean "any valid" decision if the supplemental and national grievance procedures are to be consistent. Moreover, the courts have always recognized that an arbitrator's award must draw its "essence" from the parties' collective bargaining agreement. *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960). When the arbitrator fails to heed this rule, his decision necessarily exceeds what the parties bargained for and is unenforceable in a suit under § 301. *See IBT, Local 249 v. Western Pennsylvania Motor Carriers Association,* 574 F.2d 783 (3d Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978). If the decision is unenforceable at law, the union certainly cannot employ a strike as an alternative enforcement mechanism.

In sum, the nature of the Florida locals' "grievances" and Pilot's express request for interpretation and notice to the Multi-State Committee of its request rendered invalid the Committee's decision on accretion. The Committee's decision did not therefore provide a "final and binding" ruling over which

IBT could strike. When IBT struck to enforce the decision it breached its express contractual promise that it would exhaust all available arbitral remedies before striking. *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320–1321, 8 L.Ed.2d 462, 465–66 (1962).

■ *Strike without arbitrating issues controlling the right to strike.* Putting aside what is said above and assuming that the Multi-State Committee had authority to decide the Florida locals' grievances, the question remains whether IBT could strike to enforce the Committee's decision without first arbitrating questions which affected its right to strike. IBT contends the parties' agreement gave it the plain and absolute right to strike when Pilot refused to comply with the Committee's decision. It points to Article 45 § 1(d) of the Southern Supplement which provides that "failure to comply with any Committee decision withdraws the benefits of this Article [wherein the union makes its no-strike promise]." *See also* Art. 8(d), NMFA. The Court does not agree that the provision is as absolute as IBT contends. In any event, Pilot's objections to the Multi-State Committee's proceedings and requests for interpretations by the NGC raised legitimate and substantial questions which directly affected IBT's exercise of its right to strike. IBT should have arbitrated those questions before striking. Because it did not, it further breached its contractual promise to exhaust arbitral remedies.

By its objections to the Multi-State Committee's proceedings and its requests for interpretations by the NGC, Pilot raised four substantial issues that remained unresolved when IBT struck: (1) did a Multi-State Committee have the authority to preliminarily decide whether a "grievance" was in fact a request for interpretation of the NMFA; (2) was the "grievance" asserted by the Florida locals in fact a request for interpretation of the NMFA's accretion clause; (3) could a Multi-State Committee decide a "grievance" even though one of the parties then had pending before the Area

Conference a request for interpretation of the NMFA involving the same issue posed in the "grievance;" and (4) should a Multi-State Committee, or any other arbitral committee, follow NLRB precedent when deciding accretion disputes? In turn, these questions raised other questions which directly affected IBT's right to strike: (1) could the union strike to enforce a Multi-State Committee decision predicated on an unauthorized and erroneous interpretation of the NMFA; (2) could the union strike to enforce a Multi-State Committee decision when there was pending before the Area Conference a request for an interpretation by the NGC of the same issue decided by the Committee; and (3) could the union strike to enforce a Multi-State Committee's decision on an accretion dispute when a UC petition was pending before the NLRB which raised the same accretion question? The parties' collective bargaining agreement did not answer these questions; but it did provide that such questions were arbitrable. A "no" answer to any one of the latter three questions would have negated the union's right to strike.

Each of the above questions fell within the scope of the parties' grievance procedure. Article 8(a) of the NMFA provided that the national and supplemental grievance procedures would apply to "[a]ll grievances or questions of interpretations," and Article 45 § 1 of the Southern Supplement required the use of "all possible means of settlement . . . of any controversy which might arise." No contractual provision excluded these types of questions from the arbitration process. *See International Union of Operating Engineers Local 150 v.*

*Flair Builders, Inc.,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972). Any doubt as to arbitrability should be resolved in favor of coverage. *Gateway Coal Co. v. UMW,* 414 U.S. 368, 377–79, 94 S.Ct. 629, 636–638, 38 L.Ed.2d 583, 592–93 (1974); *United Steelworkers v. Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352, 1353, 4 L.Ed.2d at 1417–18.

The parties' agreement to arbitrate virtually every dispute[22] controlled IBT's right to strike even after Pilot refused to comply with the Multi-State Committee's decision. In the circumstances of this case, IBT could strike only upon Pilot's "failure to comply with any Committee decision." Art. 45 § 1(d), Southern Supp. IBT's right to strike therefore turned on the meaning of terms which defined its right. IBT contends those terms—"failure to comply with any Committee decision"—were plain and unambiguous and allowed the union to strike despite Pilot's then pending request for interpretation by the NGC. That argument misconceives the point here. The union's right to strike was limited by specific contract terms. Pilot put the meaning of these terms in issue when it raised, explicitly and implicitly, the above enumerated questions in its objections to the Multi-State Committee and its requests for interpretations by the NGC. *See, e. g.,* Plaintiff's Exhibits 10–13. Under the parties' expansive grievance procedure, Pilot's arguments had to be submitted to arbitration before IBT could strike. IBT's belief that the agreement gave it the clear right to strike was of no significance since Pilot questioned the union's right and demanded that the issue be arbitrated.[23]

---

**22.** As is explained in its Bench Memorandum of January 19, 1977, this Court believes the parties expressly excluded from the grievance procedure any dispute over whether the union's *authorized* strike was in breach of the NMFA.

**23.** IBT cannot argue that it was unaware of Pilot's having questioned its right to strike. Pilot consistently maintained that the Multi-State Committee could not decide an accretion dispute while a request for interpretation on the same issue was pending before the Area Conference. Pilot further maintained to all union parties that only the NLRB could finally decide an accretion dispute. Those arguments

explicitly and implicitly questioned the authority and hence validity of the Multi-State Committee's decision—the basis upon which IBT struck. Pilot's argument for an injunction before the Florida District Court highlights the point: "Without [the Multi-State Committee's] decision being in effect and the fact that we must comply with it, stay our compliance with it, then [the Florida locals] have no excuse by way that they can strike. *The other locals we do have contracts with, so we don't feel we need an injunction against them.*" Motion For Summary Judgment, Exhibit 13, at p. 6 (emphasis added).

Directly on point here is the Seventh Circuit's decision in *Western Publishing Co. v. Local 254, Graphic Arts International Union*, 522 F.2d 530 (7th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 880, 47 L.Ed.2d 98 (1976). There, the employer operated two plants, and the union represented workers at both. The workers in one plant struck, forcing the employer to transfer work to the second plant. The workers at the second plant refused to handle the transferred work, however, on the ground that it was "struck work." The parties had a collective bargaining agreement which contained arbitration and no-strike clauses. An express exception to the no-strike clause was "struck work." Before transferring the disputed work to the second plant, the employer had asked for arbitration of whether the work fit within the definition of "struck work." The union had refused the offer, or at least refused to handle the work pending the outcome of arbitration. The court held the union had breached its no-strike pledge by refusing the work before and during arbitration. Noting that the definition of "struck work" was concededly arbitrable, the court reasoned that the policy favoring arbitration and peaceful resolution of labor disputes precluded the union's use of economic force before the dispute was arbitrated. It rejected the union's argument that requiring arbitration would destroy its right to strike. *Western Publishing* supports the proposition that IBT could not exercise its right to strike without first arbitrating issues central to that right. *See NAPA Pittsburgh Inc. v. Automotive Chauffeurs, Local 926*, 502 F.2d 321 (3d Cir.) (en banc), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); *Pilot Freight Carriers, Inc. v. IBT*, 497 F.2d 311 (4th Cir. 1974) (per curiam).

■ The principle thrust of the NMFA and Southern Supplement grievance procedure was that employer-union disputes should be settled by arbitration. The parties' agreement was consistent with the national labor policy favoring arbitration as a substitute for industrial strife, *Boys Markets, Inc. v. Local 770*, 398 U.S. at 249, 90 S.Ct. at 1592–1593, 26 L.Ed.2d at 209; *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 105, 82 S.Ct. 571, 577–578, 7 L.Ed.2d 593, 600 (1962), as well as the principle that a collective bargaining agreement is a framework within which the employer and union can deal with the myriad of disputes the draftsmen did not anticipate, *Gateway v. UMW*, 414 U.S. at 378, 94 S.Ct. at 637, 38 L.Ed.2d at 592; *United Steelworkers v. Warrior & Gulf*, 363 U.S. at 578–79; 80 S.Ct. at 1352–1353, 4 L.Ed.2d at 1415. The commitment to arbitration therefore outweighed the union's acknowledged right to strike. The union could exercise its right to strike only after it had "scrupulously exhausted" arbitration procedures, *Associated General Contractors v. Illinois Conference of Teamsters*, 454 F.2d 1324, 1329 (7th Cir. 1972) (Stevens, J.); when the union did otherwise it acted at its peril. The day is long past when the "nascent labor movement" and its right to strike are presumed to require absolute protection. Today's unions are healthy and capable of participating fully in the collective bargaining process. *Boys Markets v. Local 770*, 398 U.S. at 251, 90 S.Ct. at 1592–1593, 26 L.Ed.2d at 210–11; *Teamsters Local 30 v. Helms Express, Inc.*, 591 F.2d 211, 218 (3d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1980). When a union, such as IBT, affirmatively commits itself to arbitration as the primary means for dispute resolution, it should abide by that commitment. If it does not, it is liable for breach of contract.

■ *Strike while UC petition was pending before the NLRB.* When IBT struck in July 1972 to force Pilot's compliance with the Multi-State Committee's decision, Pilot's UC petition was pending before the NLRB. The petition raised the same issue decided by the Committee: did Pilot's Florida employees become a part of the national

Teamster bargaining unit solely by virtue of the NMFA's accretion clause? *Compare* Plaintiff's Exhibit 8 *with* Memorandum In Support of Motion For Summary Judgment, Exhibit 2. The NLRB Hearing Officer had held six days of hearings before the strike; and the NLRB's Regional Director would hold fifty-three additional days of hearings after the strike. Pilot and IBT participated throughout as the principle adversaries. *Pilot Freight Carriers*, 208 NLRB at 853.

The pendency of the UC petition required that IBT stay any strike action until the Board had ruled. The petition had invoked the superior authority of the Board and concerned an issue particularly within the Board's sphere of responsibility. IBT could not have doubted that the NLRB would eventually and dispositively decide the dispute. By striking as it did, IBT breached its implicit contractual promise to deal with Pilot fairly and in good faith.

The Supreme Court's decision in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), provides the primary guidance here. *Carey* involved a "jurisdictional" dispute between two unions and an employer: one union had filed a grievance asserting that employees represented by the second union were performing work reserved for the first union. The parties' collective bargaining agreement provided for arbitration of the "interpretation, application or claimed violation" of the agreement. The employer refused to arbitrate, contending the grievance presented a representational matter and was within the exclusive jurisdiction of the NLRB. The union sued under § 301 of the LMRA, 29 U.S.C. § 185, and the Court ordered that arbitration proceed. It noted that the "jurisdictional" dispute could be either of two distinct types: (1) a work assignment dispute, or (2) a representational dispute. In a work assignment dispute, the NLRA provided no remedy absent a strike or the threat of a strike. Arbitration fit well into the statutory void. As for a representational dispute, which it defined as "a controversy as to which union should represent the employees doing particular work," 375 U.S. at 263, 84 S.Ct. at 404, 11 L.Ed.2d at 323, the Court found that although either side had immediate recourse to the Board through an unfair labor practice charge or a unit clarification petition, such remedies did not preclude arbitration. The arbitrator's decision could provide guidance or be deferred to by the Board; and, in any event, its "pervasive, curative effect," which might dispose of the entire dispute, should be encouraged.

*Carey* is significant here because of the Court's discussion of the relationship between arbitration, suits under § 301, and resort to the NLRB in the context of representational disputes. The employer in *Carey* had argued that the NLRB had exclusive jurisdiction over representation issues, which foreclosed any right or need to raise the matter before the arbitrator or in a § 301 suit. The Court disagreed that the Board's jurisdiction was exclusive. It stated, however, that, in all events, the Board's authority was superior: "[s]hould the Board disagree with the arbiter . . . the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301." 375 U.S. at 272, 84 S.Ct. at 409, 11 L.Ed.2d at 328. The employer's argument also raised the connected problem of how the employer could protect itself in a representational dispute when faced with a demand for arbitration, which, given the Court's ruling on the right to arbitration, could result in breach of contract damages in a § 301 suit. The Court met this point when it stated that, although arbitration could and should proceed, "[t]he superior authority of the Board [could] be invoked at any time." 375 U.S. at 272, 84 S.Ct. at 409, 11 L.Ed.2d at 328. Thus, the Court viewed the unfair labor practice charge or the unit clarification petition as "an alternative remedy . . ., which, if invoked by the employer, [would] protect him." 375 U.S. at 268, 84 S.Ct. at 407, 11 L.Ed.2d at 326.[24]

---

24. In *Local 1547, IBEW v. Local 959, IBT*, 507 F.2d 872 (9th Cir. 1974), the Ninth Circuit explained this portion of the *Carey* decision thus:

This result [that the NLRB is the final authority in representation disputes] is analogous to the enforcement of any contract. If A and B

Court decisions subsequent to *Carey* have uniformly applied the principle that Board decisions control rulings by an arbitrator. *See, e. g., Local 7–210, OCAW v. Union Tank Car Co.,* 475 F.2d 194 (7th Cir.), *cert. denied,* 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973); *New Orleans Typographical Union 17 v. NLRB,* 368 F.2d 755, 767 (5th Cir. 1966); *International Brotherhood of Boilermakers v. Combustion Engineering, Inc.,* 337 F.Supp. 1349 (D.Conn. 1971). Thus, courts have refused to order arbitration or to enforce an arbitrator's award where the NLRB had already decided the dispositive issue. *See, e. g., Smith Steel Workers v. A.O. Smith Corp.,* 420 F.2d 1 (7th Cir. 1969); *McGuire v. Humble Oil & Refining Co.,* 355 F.2d 352 (2d Cir.), *cert. denied,* 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966); *IBT, Local 542 v. Ace Enterprises, Inc.,* 332 F.Supp. 36 (S.D.Cal. 1971). Other courts have held parties not liable for breach of contract damages where the parties' acts were consonant with subsequent Board rulings. *Local 1547, IBEW v. Local 959, IBT,* 507 F.2d 872, 878 (9th Cir. 1974); *Local 7–210 v. Union Tank,* 475 F.2d at 197. And courts have held that an employer need not comply with an arbitrator's decision when doing so would, under former Board rulings, force the commission of an unfair labor practice. *General Warehousemen & Helpers Local 767 v. Standard Brands, Inc.,* 579 F.2d 1282, 1291 (5th Cir. 1978), *cert. denied,* 441 U.S. 957, 99 S.Ct. 2420 (1979); *Glendale Manufacturing Co. v. Local 520, ILGW,* 283 F.2d 936, 938 (4th Cir. 1960), *cert. denied,* 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243 (1961). Moreover, *Carey* has lead courts to approve stays of § 301 suits to enforce arbitration awards when the same dispute is pending before the NLRB. *See, e. g., United Association of Journeymen & Apprentices of the Plumbing & Pipe Fitting Industry, Local 525 v. Foley,* 380 F.2d 474 (9th Cir. 1967) (per curiam); *McGuire v. Humble Oil,* 355 F.2d 352; *Boilermakers v. Combustion Engineering,* 337 F.Supp. 1349; *cf. Local 588 v. NLRB,* 565 F.2d at 778. These cases support the proposition that, once the NLRB begins consideration of the issue disputed by the parties, neither party may force resolution by alternate means.

The courts have also recognized that exercise of the Board's superior authority is particularly appropriate in disputes over accretions. *Pittsburgh Plate Glass v. NLRB,* 313 U.S. at 152, 61 S.Ct. at 912, 85 L.Ed. at 1258; *Local 3–193 v. Ketchikan,* 611 F.2d 1295. Section 7 of the NLRA, 29 U.S.C. § 157, provides that "[e]mployees shall have the right to self-organization [and] . . . to bargain collectively through representatives of their own choosing, . . . and shall also have the right to refrain from any or all of such activities . . . ." Section 9(b) of the NLRA, 29 U.S.C. § 159(b), provides that "[t]he Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." To effectuate these provisions, subsection (c) of section 9 directs that an employee, union, or employer may petition the Board to determine the need for an election or, as was the case here, the appropriateness of the bargaining unit. *See* Plaintiff's Exhibit 8. These statutory provisions evince Congress' plain intention that the Board, instead of the unions and employers, have the authority to finally determine workers' representational rights. The § 9

---

enter into a contract, and litigation results from an alleged breach, the trial court (or the arbitrator) may find in favor of A. The appellate court (or the NLRB) may in due course find in favor of B. A does not, by winning the first decision, become entitled to damages. The *Carey* case precludes the award of damages against an employer who is in compliance with the NLRB determination, even though the employer may have refused to bargain with the union that 'won' the antecedent arbitration. The primacy of the NLRB's decision supersedes any damage award made by an arbitrator, just as an appellate-court decision reversing a trial-court judgment supersedes that judgment. 507 F.2d at 878.

petition and hearing are the mechanisms by which parties can resolve representational disputes with a minimum of disruption.[25] *Local 3–193 v. Ketchikan*, 611 F.2d at 1299; *Workers v. A.O. Smith*, 420 F.2d at 9.

■ The arbitral process although encouraged, ultimately does not protect the rights of workers affected by an accretion clause. The arbitrator's primary function is to interpret the parties' contract; ordinarily, he has no duty to abide by the NLRA. And he inevitably considers the rights of allegedly accreted workers as secondary to the contract rights of the employer and union. *Boire v. IBT*, 479 F.2d at 803; *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 678 (2d Cir. 1971).

■ As a consequence of the Board's statutory duty to safeguard workers' rights to self-determination and the arbitrator's inherent tendency to overlook those rights, the Board seldom defers to the arbitrator's decision in an accretion dispute. Thus, in this very case, when IBT argued to the NLRB that it should defer to the NGC's ruling, the Board stated:

> Contrary to the contention of the Union, the award of the National Grievance Committee that Pilot's Florida operation constitutes an accretion does not govern or guide the Board in its disposition of the issue presented here. As we said in *Combustion Engineering, Inc.*, 195 NLRB 909 [1972], despite the award 'it is nevertheless the obligation of the Board to determine whether the employees . . . constituted an accretion to the existing unit.'

*Pilot Freight Carriers*, 208 NLRB at 857 n.12; *accord Boire v. IBT*, 479 F.2d at 794–95; *NLRB v. Horn & Hardart*, 439 F.2d at 682; *Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352, 1355 (9th Cir. 1970). To determine whether the employees have been accreted, the Board applies NLRA standards, not contract terms, to the facts of the particular case. *See, e. g., Westinghouse Electric Corp. v. NLRB*, 506 F.2d 668 (4th Cir. 1974); *Sheraton-Kauai Corp. v. NLRB, supra.* Therefore, the union and employer cannot reach a "final and binding" agreement on accretion. Any employer-union agreement purporting to abstractly define an accretion usurps the § 7 rights of the affected workers. *Workers v. A. O. Smith*, 420 F.2d at 12; *Retail Clerks International Association v. Montgomery Ward & Co.*, 316 F.2d 754 (7th Cir. 1963).

■ The ultimate point here is that the arbitrator cannot in accretion disputes render a decision that is "final and binding" on the employer and union. In *Boire v. IBT*, 479 F.2d 778, the Fifth Circuit affirmed the grant of a preliminary injunction in a companion to the instant case. The court discussed many of the points disputed here. In answer to IBT's argument that, given the "final and binding" clause of the NMFA, Pilot was required to comply with the grievance committee's interpretation of the accretion clause,[26] the court stated:

> The final, binding effect of arbitration, so essential to labor peace, is not fully applicable where the questions before the arbitrator are almost wholly representational and potentially subject to the superior authority of the Board. When the central problem is one of the unit's appropriateness, the arbitrator is powerless to give a decision that will be 'final and binding' on the parties. The Board will only defer to the decision if it is consistent with Board standards. The arbitrator can give only a final interpretation of

---

**25.** As held in *Carey*, the existence of a remedy before the Board under § 9 does not preclude arbitration or § 301 suits involving representation issues. A variety of courts have approved arbitration of an accretion dispute even though a § 9 petition was being considered by the NLRB. *See, e. g., Local 3–193 v. Ketchikan*, 611 F.2d at 1298–99; *Local 588 v. NLRB*, 565 F.2d at 777; *Boire v. IBT*, 479 F.2d at 801; *Local 400 v. A & P*, 480 F.Supp. at 92. Arbitra-tion tends to have a calming effect on the parties and may in fact resolve the dispute. However, no court has approved *implementation* of an arbitrator's decision on accretion while the Board was still considering the matter. *See, e. g., Local 525 v. Foley*, 380 F.2d 474.

**26.** IBT's argument in *Boire* was based on the National Grievance Committee's interpretation of the NMFA accretion clause.

the contract, and in representation matters it is clear that the parties are not at liberty to determine the appropriate unit. Where the arbitration award that is sought and received potentially runs afoul of the Act and threatens the Board's primary authority to determine the appropriate unit, it does not provide blanket insulation from unfair labor charges, particularly where, as here, the Board's processes have already commenced.

The thrust of *Carey* is that resolution of contractual issues can often render the Board's determination unnecessary or, at least, can aid the Board in resolving representational matters where contract interpretation is at issue. . . . Here, however, where the award sought was almost purely a unit determination involving the § 7 rights of 140 employees, we fail to see how the parties could have expected the award to be 'final' when every case since *Carey* explicitly states that the Board's authority is superior. 479 F.2d at 802–803; *accord, Local 3–193 v. Ketchikan,* 611 F.2d at 1301; *Local 1547 v. Local 959,* 507 F.2d at 878; *Local 7–210 v. Union Tank* 475 F.2d at 199.

IBT argues that, even if its strike was an unfair labor practice or in violation of general federal labor policy, the strike was not a breach of its collective bargaining agreement with Pilot. Neither the NMFA nor the Southern Supplement, argues IBT, contained any terms which limited the union's right to strike once an employer refused to comply with a majority grievance committee decision; and, since the union's right to strike in such circumstances was absolute, there could be no breach of contract once Pilot refused to abide by the Multi-State Committee's ruling. Moreover, IBT asserts, this Court cannot transform an unfair labor practice into a breach of contract, the two being entirely separate issues.

The basic flaw in IBT's position is the assumption that an obligation cannot be implied from either contractual terms or the nature of the contract itself. Courts have always found implied promises in con-

tracts. *See* 3 *Corbin on Contracts* §§ 561–64 (1960). The principal example of an implied promise in a collective bargaining agreement comes from the Supreme Court's decision in *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). There, the Court found an implied no-strike promise in the parties' agreement to be bound by compulsory arbitration and said: "To hold otherwise would obviously do violence to accepted principles of traditional contract law. Even more in point, a contrary view would be completely at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare." 369 U.S. at 105, 82 S.Ct. at 578, 7 L.Ed.2d at 600. *Accord, United Construction Workers v. Haislip Baking Co.,* 223 F.2d 872, 876–77 (4th Cir.), *cert. denied,* 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).

Moreover, the fact that the union's strike may have been an unfair labor practice is highly relevant to the issue of whether the strike was a breach of contract. In its seminal decision in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that, when deciding § 301 suits, federal courts should apply a federal common law fashioned from the policy of the national labor laws:

The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem.

353 U.S. at 457, 77 S.Ct. at 918, 1 L.Ed.2d at 980–81. The Court reaffirmed this policy in *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 255, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46, 52–53 (1974). The national labor laws therefore act as a perimeter within which employer, union,

and employee must deal with one another. Contractual agreements which require conduct violative of the national labor laws are necessarily unenforceable. *Local 767 v. Standard Brands*, 579 F.2d at 1291; *Local 7–210 v. Union Tank*, 475 F.2d at 199; *Workers v. A. O. Smith*, 420 F.2d at 7, 10; see *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 235 (4th Cir. 1975) (discriminatory contract terms not binding). The parties' right to contract is not absolute, *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146, 153 (1970); in determining rights and duties in a collective bargaining agreement, the court must always consider national labor policy. *Gateway v. UMW*, 414 U.S. at 382, 94 S.Ct. at 639, 38 L.Ed.2d at 594–95; *Local 174 v. Lucas Flour*, 369 U.S. at 105, 82 S.Ct. at 579, 7 L.Ed.2d at 600; *Workers v. Haislip Bakery*, 223 F.2d at 876–77.

Courts deciding § 301 suits have consistently recognized a "covenant of good faith and fair dealings which must inhere in every collective bargaining contract if it is to serve its institutional purposes." *United Steelworkers, Local 4264 v. New Park Mining Co.*, 273 F.2d 352, 356 (10th Cir. 1959); accord, *Workers v. A. O. Smith*, 420 F.2d at 8–9; *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 68 (3d Cir. 1965); *Bituminous Coal Operators' Association, Inc. v. UMW*, 431 F.Supp. 774, 779–80 (W.D.Pa.1977), aff'd in part, rev'd in part on other grounds, 585 F.2d 586 (3d Cir. 1978); *Lodge 743, International Association of Machinists v. United Aircraft Corp.*, 299 F.Supp. 877 (D.Conn. 1969). Implying a promise to deal fairly and in good faith is consistent with national labor policy and general contract law. One goal of the labor statutes is that employers and unions deal with disputes openly and maturely to maintain industrial peace. *See Teamsters Local 30 v. Helms*, 591 F.2d at 218. And the statutes provide specifically that neither unions nor employers may refuse to bargain or may abridge the employees' right to determine their representative. 29 U.S.C. § 158(a)(1), (5) & (b)(1), (3). To be sure, the law preserves the unions' right to strike, but that right does not exist in a void; the union is always constrained by its contractual promises and its responsibilities under the labor laws. As for general contract law, courts have always found in contracts an implied promise not to hinder the performance of the other party. 3 *Corbin* § 571.

A promise to deal fairly and in good faith should be read into the Pilot-IBT contract. Such a promise is not only consistent with labor policy and contract law, but also with the terms of the NMFA and Southern Supplement. The parties agreed to arbitrate "all grievances or questions of interpretations," Art. 8(a), NMFA, and "any controversy which might arise," Art. 45 § 1, Southern Supp. The Southern Supplement also stated (Art. 45 § 1) "there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement . . . ." The parties' grievance mechanism was comprehensive and designed to resolve disputes rapidly and conclusively. In the event of a strike, the parties presumed the strike was unauthorized, and the union promised to "make every effort to persuade the employees to commence the full performance of their duties . . . ." Art. 8(a)(3)(a), NMFA. These and other provisions evidence the parties' desire to resolve their disputes in peaceful, orderly, and mature fashion; the contract in no way suggests an intent to delete the duty of dealing with one another fairly and in good faith. *Cf. Carbon Fuel Co. v. UMW*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).

IBT's strike in July 1972 was a mean and vindictive act, a violation of its promise to act fairly and in good faith. When IBT struck, Pilot's UC petition was pending before the NLRB. Indeed, the Board had already conducted its first hearings. The petition raised the same accretion issue decided by the Multi-State Committee. IBT was aware of these facts. It was also aware, as a matter of law,[27] that the Board was charged with safeguarding employees' § 7 rights, that the Board's authority was

---

27. *See Carbon Fuel v. UMW*, 444 U.S. at 212, 100 S.Ct. at 410, 62 L.Ed.2d at 402.

superior to that of any arbitrator, and that, when resolving an accretion dispute, the Board rarely deferred to an arbitrator's interpretation of the contract. In 1970, the Board had stated these principles in deciding another accretion dispute involving the Teamsters. *Pix Manufacturing Co.*, 181 NLRB 88, 90 (1970). IBT was also aware that, with the UC petition pending, it could not enforce the Committee's decision by suing under § 301. Because of the Supreme Court's decision in *Carey v. Westinghouse*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320, IBT knew that, by invoking the NLRB's superior authority, Pilot had protected itself from § 301 damages. *See, e. g., Local 525 v. Foley*, 380 F.2d 474. Moreover, IBT had no need for immediate resolution of the dispute. Its Florida locals had already waited eighteen months before filing their grievances. And, as of the strike, not a single Pilot employee in Florida had signed a union card. Final Pre-Trial Order ¶ (5)(f). Despite these circumstances, IBT demanded that Pilot comply immediately with the Committee's decision and struck when Pilot refused. Such conduct was unreasonable and mean spirited, and completely at odds with the duty of fair play that inheres in every labor agreement.

IBT's justification for striking is that it had a contractual right to do so. Given the pendency of the UC petition, that argument is simply incorrect. Moreover, it equates going on strike with any other contractual right. Striking is not such a simple matter, however; it removes a labor dispute from the private sphere and interjects it into the public sphere. *Union 17 v. NLRB*, 368 F.2d at 767; *International Association of Bridge, Structural & Ornamental Ironworkers, Local 395 v. Lake County, Indiana Council of the United Brotherhood of Carpenters*, 347 F.Supp. 1377, 1383 (N.D.Ind.1972). The union may not strike simply because the contract gives it that right. The contract right may be illegal under the labor laws. In every case, the union must make an independent determination that, in addition to being in accord with the express terms of the parties' contract, a strike does not violate the labor law which is impliedly a part of its contract.

IBT's position is also inconsistent with its conduct in virtually identical accretion disputes with other employers. In those disputes, IBT sued under § 301 to enforce its victory at arbitration. *Local 208 v. Braswell*, 422 F.2d 109; *Teamsters Local Unions v. Braswell Motor Freight Lines, Inc.*, 392 F.2d 1 (5th Cir.), *modified*, 395 F.2d 655 (1968), *cert. denied*, 401 U.S. 937, 91 S.Ct. 926, 28 L.Ed.2d 217 (1971); *Southern Conference of Teamsters v. Red Ball Motor Freight, Inc.*, 374 F.2d 932 (5th Cir. 1967). In one of those cases, the employer attacked the union's contractual right to strike and to ignore a § 301 suit as an enforcement mechanism, and the union responded, "an answer is we are in court, we are not in the street." *Local 208 v. Braswell*, 422 F.2d at 114.

■ *Strike to force Pilot to commit an illegal act.* The Multi-State Grievance Committee ruled in June 1972 that Pilot's Florida operations were an accretion to the national bargaining unit. The ruling required Pilot to recognize the NMFA as applicable to its Florida operations. When Pilot refused to comply with the Committee's decision, the union struck to force compliance. The NLRB has ruled, however, that, notwithstanding the NMFA's accretion clause, the Florida operations were not an accretion. The Board's ruling is res judicata on the factual aspect of the parties' dispute. And considered with the applicable legal principles, the Board's ruling establishes that Pilot would have committed an unfair labor practice had it unilaterally extended the NMFA to its Florida employees. Since unilateral extension of the NMFA was the precise object of IBT's strike, the conclusion. follows that IBT struck to force Pilot to commit an unfair labor practice. That conduct was a breach of IBT's implied promise to deal with Pilot fairly and in good faith.

The parties have always agreed that the principal holding in the Multi-State Grievance Committee's decision was that Pilot's Florida operations were accretions to the

national bargaining unit. Given that finding, the accretion clause of the NMFA (Art. 2 & 3) required—and the Committee ordered—that the NMFA be applied to Pilot's Florida operations. IBT acknowledges it struck to force that result.

The NLRB has now found, in ruling on Pilot's UC petition, that the Florida operations were not accretions to the national bargaining unit:

On these facts, we find that each of the Florida terminals or the four terminals together, may constitute an appropriate unit, and that the extension of the 1970 contract would, as the Board said in *Melbet Jewelry Co., Inc.*, 180 NLRB 107, 109, 110:

. . . do serious violence to the mandate that employees' rights are to be protected and that appropriate unit findings under Section 9(b) must be designed to preserve these rights.

We will not . . . under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit without allowing those employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the Union to represent them.

We therefore conclude that the employees of Pilot at its four Florida terminals should be excluded from the national bargaining unit, and we shall, accordingly, grant the petition.

*Pilot Freight Carriers, Inc.*, 208 NLRB 853, 858 (1974). The Board's ruling is res judicata on the factual question of whether the Florida operations were accretions.

■ All the elements required for a finding of res judicata are present. The issue of accretion is the same as that decided by the NLRB. Pilot and IBT were the principal parties before the Board and the same is true here. In both instances, their positions have been antagonistic or adversarial. The Board's hearing on Pilot's UC petition was full and fair. The Board received volumes of oral and documentary

evidence during some sixty days of hearings, heard oral argument, and received briefs from both sides. It then made findings of fact and conclusions of law and issued an order redefining the national bargaining unit. IBT has never suggested it did not have an adequate opportunity to litigate its case; and, from its own review of the Board's opinion, this Court perceives no grounds for such an argument. The Board properly applied the various tests applicable to accretion questions. In fact, the Fourth Circuit has cited the Board's reasoning in *Pilot* as the appropriate standard. *Westinghouse Electric Corp. v. NLRB*, 506 F.2d 668, 672–73 (4th Cir. 1974). *See Sheraton-Kauai v. NLRB*, 429 F.2d 1352. Lastly, the Board's decision was final. IBT could have challenged the Board's ruling by refusing to comply. Its refusal would have caused the Board to issue an unfair labor charge. If IBT had lost at that stage, it could have appealed to the appropriate federal court of appeals. *Pittsburgh Plate Glass v. NLRB*, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); *A. F. L. v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). IBT chose not to challenge the Board's decision, however. Its acquiescence rendered the Board's § 9 proceeding and ruling final and binding. *McGuire v. Humble Oil*, 355 F.2d at 357.

The Supreme Court has specifically approved the application of res judicata principles to administrative proceedings: "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce 'repose.'" *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642, 661 (1966). This Court has found no instances where res judicata has been applied or rejected as inapplicable to § 9 proceedings. However, a number of courts have held Board unfair labor practice rulings res judicata in secondary boycott suits under 29 U.S.C. § 187. *See, e. g., International Wire v. Local 38,*

*IBEW*, 475 F.2d 1078 (6th Cir.) (per curiam), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Paramount Transport Systems v. Chauffeurs, Local 150*, 436 F.2d 1064 (9th Cir. 1971) (per curiam). No good reason appears why the rationale cannot apply to § 9 proceedings.

Hearings held pursuant to § 9 are intended to fully and finally resolve representation disputes. 29 U.S.C. § 159(d); *see* 29 C.F.R. § 102.66 (1975). The Fourth Circuit has specifically held that the Board's procedural standards for representational hearings satisfy due process requirements. *NLRB v. Union Brothers, Inc.*, 403 F.2d 883, 886–88 (4th Cir. 1968). Thus, the Board has established the rule that, absent previously unavailable or undiscovered evidence, parties may not relitigate a representation issue in a subsequent unfair labor practice proceeding. 29 C.F.R. § 102.67(f) (1975); *see* 29 U.S.C. § 159(d). The Supreme Court and a variety of circuit courts have approved the Board's practice. *Pittsburgh Plate Glass v. NLRB*, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; *NLRB v. W. S. Hatch Co.*, 474 F.2d 558, 562–63 (9th Cir. 1973); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 683 (2d Cir. 1971); *NLRB v. Union Brothers*, 403 F.2d at 886–88; *see Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971). Moreover, the courts have held uniformly that selection of an appropriate bargaining unit lies largely within the Board's discretion and that the Board's decision, though not final, is disturbed only if clearly inappropriate. *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844–1845, 48 L.Ed.2d 382, 387 (1976) (per curiam); *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032 (9th Cir. 1978); *Boire v. IBT*, 479 F.2d at 797; *NLRB v. Horn & Hardart*, 439 F.2d at 682. Therefore, when a party, such as IBT, waives its right to appeal a § 9 ruling, allowing the ruling to become final, no due process principle is offended by treating the ruling as res judicata in a collateral breach of contract suit under § 301.[28]

The NLRB's finding of no accretion compels the conclusion that Pilot could not have implemented the arbitrator's contrary decision without committing an unfair labor practice. Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), provides: "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [NLRA § 7]." An employer therefore commits an unfair labor practice when it bargains with or unilaterally recognizes a union which does not represent a majority of its employees. *NLRB v. Local 588, Retail Clerks International Association*, 587 F.2d 984, 986 (9th Cir. 1978); *Sperry Systems Management Division v. NLRB*, 492 F.2d 63, 69 (2d Cir.), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *Local 7–210 v. Union Tank*, 475 F.2d at 197; *McGuire v. Humble Oil*, 355 F.2d at 358; *Glendale v. Local 520*, 283 F.2d at 938. The employer may not defend on the ground that it was complying with an arbitrator's decision. As a practical matter, once a union is recognized by the employer, decertification and other statutory procedures do not effectively loosen the union's handhold and accord affected employees the opportunity to fully exercise their § 7 rights. *Boire v. IBT*, 479 F.2d at 801.

**28.** IBT argues the reasoning in the Supreme Court's decision in *ITT v. Local 134, IBEW*, 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975), precludes the application of res judicata here. In *ITT*, the Court held, *inter alia*, that findings made in a § 10(k) hearing, 29 U.S.C. § 160(k), were not res judicata in a subsequent unfair labor practice proceeding. The § 10(k) proceeding, and hence the *ITT* decision, is distinguishable on a variety of grounds. First, the § 10(k) proceeding is investigatory and nonadversarial; no findings of fact or conclusions of law are made; and the "Board's § 10(k) determination is not unlike an advisory opinion . . . ." 419 U.S. at 446, 95 S.Ct. at 611, 42 L.Ed.2d at 572. Second, the § 10(k) proceeding does not result in an order that either party must obey. Third, at the subsequent unfair labor practice proceeding, either party may introduce new evidence. Fourth, the standard of proof for finding a violation of the NLRA becomes more substantial in the unfair labor practice proceeding.

640

■ The fundamental policy of the NLRA is the right of self-determination. *Local 3–193 v. Ketchikan*, 611 F.2d at 1299–1300; *Metromedia, Inc., KMBC–TV v. NLRB*, 586 F.2d 1182, 1191 (8th Cir. 1978); *Local 767 v. Standard Brands*, 579 F.2d at 1293. Consequently, the NLRB generally denies the efficacy of accretion clauses, *NLRB v. Local 588*, 587 F.2d at 986; *Local 588 v. NLRB*, 565 F.2d at 772 n.5; and this is particularly true when the affected employees comprise an individual, identifiable unit, *Boire v. IBT*, 479 F.2d at 794–95; *NLRB v. Horn & Hardart*, 439 F.2d at 682; *Sheraton-Kauai v. NLRB*, 429 F.2d 1352. Given the Board's decision that Pilot's Florida operations were not an accretion, but were separate from the national unit, this Court has no doubt that the Board would also hold that Pilot's unilateral extension of the NMFA to those operations would be an unfair labor practice.

This Court has previously outlined IBT's implicit promise to deal with Pilot fairly and in good faith. That discussion is equally applicable here and need not be repeated. IBT's promise required that it not strike to force Pilot to commit an unfair labor practice.

IBT cannot defend on the ground that, when it struck in July 1972, it did not know the NLRB would reverse the Multi-State Committee's accretion decision. At the time of its strike, IBT knew the NLRB had the ultimate responsibility and authority to determine whether the Florida operations were an accretion. Pilot had, by its UC petition, invoked the Board's authority to decide the dispute. The § 9 hearing was specifically designed to resolve such controversies; and Pilot's turning to the Board was precisely the course suggested by the Supreme Court in *Carey v. Westinghouse*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320. IBT also knew the Board took "an extremely narrow view," *Boire v. IBT*, 479 F.2d at 796, of contractual accretion clauses. Indeed, in 1970, the Board had specifically rejected a Teamster argument that the NMFA's accretion clause controlled a § 9 representation determination. *Pix Manufacturing Co.*, 181 NLRB 88 (1970). IBT

was aware further that, if Pilot complied with IBT's demand and implemented the NMFA and the Board then ruled there was no accretion, Pilot would be liable to its Florida employees for an unfair labor practice. In such circumstances, IBT need not have known that the arbitrator's decision would be reversed; the distinct possibility that the decision would be reversed was enough to require that IBT postpone its strike until the NLRB had ruled.

IBT demanded, however, that Pilot comply immediately with the Committee's decision. That demand presented Pilot with the dilemma of choosing between breaching the parties' contract or committing an unfair labor practice. IBT apparently believed Pilot would rather suffer unfair labor practice damages than risk catastrophic losses in a strike. Pilot having chosen the other course, IBT should not be surprised that its cynical and vindictive conduct exposes it to breach of contract damages.

Moreover, the Supreme Court's decision in *Carey v. Westinghouse* supports this result. In *Carey*, the Court noted that the employer might ignore the arbitrator's ruling and still avoid § 301 damages if its conduct was in accord with a subsequent NLRB ruling. 375 U.S. at 272, 84 S.Ct. at 409, 11 L.Ed.2d at 328. One meaning of the Court's statement is that, since the Board's ruling will control that of the arbitrator, a party to a representation dispute acts at his peril when he acts before the Board has rendered its § 9 decision. The only way a party can avoid the risk of § 301 damages is to invoke the Board's authority. Since IBT refused to acquiesce in the § 9 proceedings, it struck at its peril; and, given the Board's subsequent ruling of no accretion, it must pay the consequences.

IBT also cannot justify its strike on the ground that it had a contractual right to strike. The Court rejected the same argument above and the reasons assigned there, p. 637 *supra*, are equally applicable here. Suffice it to say, IBT cannot use an asserted contractual right as justification for

forcing Pilot to break the national labor laws.

*Conclusion*

For the reasons set out above, this Court holds that, as a matter of law, IBT breached its collective bargaining agreement with Pilot in four distinct ways. Pilot is therefore entitled to a directed verdict on the issue of liability.[29] A judgment will be entered in accord with this Opinion and the Jury's verdict.

## JUDGMENT

This case was tried before the Court and a jury between May 5 and May 13, 1980. At the close of all the evidence the Court directed a verdict for the plaintiff on the liability issue and submitted the damages issue to the jury. After deliberation, the jury returned its verdict as follows:

1. What damages, if any, is the plaintiff, Pilot Freight Carriers, Inc., entitled to recover from the defendant?

$3,030,625.00

Now, therefore, based upon the directed verdict and Memorandum Opinion filed contemporaneously herewith, and the verdict of the jury, it is ORDERED, ADJUDGED and DECREED that the plaintiff have and recover of the defendant the sum of $3,030,-625.00, together with its costs in this action.

---

[29]. Although IBT's counsel may take small comfort from this, the Court wishes to acknowledge counsel's considerable assistance. IBT's briefs were extensive, well researched, and well written. In several instances, counsel's papers raised arguments and pointed to legal principles the Court had not considered. The fact that the Court disagrees with much of what counsel said does not alter its opinion of the quality of their work. Even a master craftsman cannot make a silk purse out of a sow's ear.